Anthony Jerome HARRIS, Gary Middaugh, Theodore Ford, Doyle King, Randy Meyer, Terry Crisp, Michael Farmer, John Honeycutt, Coy Hill, Troy Brown, Deems Rowell, Gordon Bunton, Adam Wright, Robert Manous, Kimball Foreman, Joe Headrick, Terry Steward, Arthur Blackmon, James Smith, Stephen Ross, Johnny Smith, Larry Brown, Walter Robinson, Roger Williams, Kenneth Owens, Marshall Gee, Kelly Craig, Gilbert Payne, Danny Green, Calvin Eslick, Paul Rogers, Michael Smith, Nathaniel Jackson, Johnny Romo, Jeffery Lea, Johnny Davis, Chester Watkins, Ricky Wyatt, Aron Cox, Nero Tecumseh, Joseph Osborne, Joseph Dicesare, William Knittel, James McClain, Eddie Coats, Walter Bowers, Huey Hall, Ronnie Moore, Shane Boggs, Willie Taylor,

Clarence Bramlett, Bruce Hill, Larry Ives, Donald Myles, Kevin Cole, Larry Crawley, Edward Teichman, Keith Larkins, Leonard Goudeau, Joel Vanscoy, Robert Richards, Michael Broadnax, Rufus McGee, Kyle Cheadle, Steve Seitz, Timothy Whipkey, Adrian Collins, William Severe, Robert Brixey, Kevin Parker, Lloyd Harjo, Kenneth Burrell, Louis Washington, David Copple, Fred Cook, Robert Schneider, Joel Allen, Boyce Vandenburg, Jerry Stiles, Tony Abney, Jackie L. Adair, Robert Anderson, Ascension Armendariz, Larry Bailey, Charles Barnett, Rogelio Bege, J.C. Berry, Lavern Berryhill, Perry Biffle, Jackie Blanton, Douglas Breeden, Gregory Brians, Arthur Brown, Bobby Bruce, Derek Burger, Larry Butcher, John Byrd, James Cagle, Clifford Campbell, Douglas Capps, Gerald Carroll, Toriano Chandler, Joe Chase, Clyde Chuculate, Joseph Cloud, Johnny Cole, Pam Colley, Ronald D. Copper, Dennis Cornell, Cyndi Cornell, Germaine Crawford, Rickie Crisp, James Crow, Gerald Daniels, Brian Daniels, Richard Demes, Ronnie Dial, Alfonso Duran, Larry Edwards, Andrew Ephriam, James L. Evans, J.W. Fatherree, Lance Foster, Donnie Joe Frye, Dennis Gaines, Louis Gibson, Ronnie Gilmore, James Godbey, Forest Golbek, Jerry Graham, Lantze Green, Bryan Griffin, James Hamilton, David P. Hammer, Lauren Hankins, Eual Hardt, Michael Hayes, Randy Henderson, Eldon Henderson, Andrea Hester, Archie Hill, Dewayne Holland, Harold Holman, Thomas Honeycutt, Michael Houston, C. Huffstutler, Keith Hunt, Dorris Jackson, Napoleon James, Willie Jemison, Allen Jones, Allen Kaulaity, Jeffery King, Robert Kluver, Fred Knisley, Millard Knox, Clarence Landreth, Bernard Lawson, Odis Lawson, Jr., Qunion Leigh, Frank Logan, Laura Long, Joseph Lyda, Brian Maffee, McKinley Mahan, Patrick Martin, Elijah Martin, Leobardo Martinez, Barry McClure, Glenn McGuire, Patrick Meadows, Juan Mercado, Walter Miller, Jackie Miller, Larry Mills, Gary Minard, William Moore, Abdullah Muhammad, Darphus Murray, Steven Ness, George Nichols, Michael Norman, James Northcross, Richard Olsen, Carmen Patton, Dixie Pebworth, Roger Peterman, Rick Petrick, Gregory Poe, William P. Potts, Michael Prater, James Price, Steven Pyles, Nillson Ramirez, Christopher Ransom, Hazen Ray, Terry Reeves, Kenneth Reynolds, Terrance Richards, Eddie Richie, Michael Riggs, T.J. Roby, Arthur Rodriguez, Victor Rose, Kenneth L. Russell, David Russell, David Sadler, Samuel Sanner, William Sherburn, Monty Shockey, Mary Shoffner, Wayne Shull, Donald Sibit, Canova Singleton, John Smith, Danny Smith, Terry Smith, Michael S. Smith, Anthony Steele, Richard Stone, Thomas Strother, Jamie Struble, H. Stumblingbear, Sherman Surface, Stacey Sutton, Stephen Thomas, David Thomas, Jon Tibet, Johnny Tilley, Roscoe Tilley, Lyman Tomlin, Floyd R. Turner, Cheryl Wagner, Larry Walker, Michael Walling, Walter Walters, Warren Ward, Leslie Warledo, Johnny Washington, Orland Wasson, Joseph Watkins, Thomas Weaver, Andrew West, Jack Whitlock, Robert Whittier, Billy D. Wilkins, Tyrone Williams, Marty Williams, Jack Williams, Thurman Wilson, Donald Wilson, Willie Wilson, Randy Wood, Kevin Wood Sr., Robert Woods, Billie Woolsey, Charles Wooten, Galen Wooten, Sharlene Workman, Coy Yocham, Floyd Zeigler, Floyd Harris, Roosevelt McCoy, Gregory Mundine, Donald O'Shields, Gerald Thompson, Terry P. Crow, Brian Leroy Jordan, Terry Lynn Rhine, Leron Robinson, Carol Ann Pierce, Richard Lee Johnson, Robert M. Estrada, David Richard, Petitioners–Plaintiffs–Appellants,

v.

Ron CHAMPION, Steve Hargett, Stephen Kaiser, Bobby Boone, Dan Reynolds, Joy Hadwiger, R. Michael Cody, Edward Evans, R. Jack Cowley, Neville Massie, H.N. Scott, Sue Frank, Denise Spears, Earl Allen, Jim Sorrels, Wardens, and all other Wardens of Correctional Facilities of the State of Oklahoma having custody of any of the Plaintiffs; the

Oklahoma Department of Corrections; Gary Maynard, the Director of the Oklahoma Department of Corrections; the Oklahoma Court of Criminal Appeals; the Judges of the Oklahoma Court of Criminal Appeals, to-wit, Honorable James F. Lane, Honorable Gary L. Lumpkin, Honorable Tom Brett, Honorable Ed H. Parks, and Honorable Charles A. Johnson; the State of Oklahoma; the Oklahoma Indigent Defense System; Henry A. (Hank) Meyer, III, Chairman, Richard Reeh, Doug Parr, Richard James, and Becky Pfefferbaum, M.D., individually and as Members of the Oklahoma Indigent Defense System Board; Patti Palmer, individually and as Executive Director of the Oklahoma Indigent Defense System; and, E. Alvin Schay, individually and as Appellate Indigent Defender, i.e., Chief Administrative Officer of the Oklahoma Appellate Indigent Defender Division, Respondents–Defendants–Appellees.

Nos. 93–5123, 93–5209.

United States Court of Appeals, Tenth Circuit.

Jan. 26, 1994.

1544

David Booth of R. Thomas Seymour, Tulsa, Oklahoma, for Petitioners–Plaintiffs–Appellants.

Diane L. Slayton, Assistant Attorney General (Susan B. Loving, Attorney General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Warden Respondents–Defendants–Appellees.

J. Warren Jackman (William A. Caldwell, with him on the brief), of Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Oklahoma (and Gary Peterson, with him on the brief, Oklahoma City, Oklahoma), for Oklahoma Indigent Defense System Respondents–Defendants–Appellees.

John M. Imel (John E. Rooney, Jr., with him on the brief), of Moyers, Martin, Santee, Imel & Tetrick, Tulsa, Oklahoma (and Gail L. Wettstein, with him on the brief, Oklahoma City, Oklahoma), for Oklahoma Court of Criminal Appeals Respondents–Defendants–Appellees.

Before LOGAN, BRORBY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

These consolidated habeas appeals, which come to us after our remand in *Harris v. Champion*, 938 F.2d 1062 (10th Cir.1991) (*Harris I* ), require us to revisit the problem of appellate delay in the Oklahoma criminal justice system. In *Harris I*, we ruled that the United States District Court for the Northern District of Oklahoma should have excused an Oklahoma prisoner's failure to exhaust his state remedies before seeking federal habeas relief in light of extensive delay by the state public defender in filing an opening brief in the prisoner's direct criminal appeal. 938 F.2d at 1065–66, 1071. We remanded the action to the district court and directed it to investigate the possibility of systematic delay in the filing of briefs by the Oklahoma Appellate Public Defender System (Public Defender).[1] *Id.* at 1071. In a subsequent opinion, we expanded the scope of inquiry on remand to include a consideration of the entire criminal appellate process in Oklahoma insofar as it contributes to delay in deciding direct criminal appeals of indigent defendants. *Hill v. Reynolds,* 942 F.2d 1494, 1496–97 (10th Cir.1991). We now consider the results of the district court's rulings on remand.

In this opinion we are called upon to address several issues arising out of the delay in processing petitioners' direct criminal appeals, including whether petitioners must exhaust their state remedies before seeking habeas relief in federal court and whether the delays in the state appellate process have violated petitioners' rights to due process, equal protection, or effective assistance of counsel. The record before us shows that many of these petitioners, all of whom are indigent and were represented by the Public Defender in their direct criminal appeals, had to wait three or more years before a brief was filed on their behalf in their respective direct criminal appeals. Some petitioners also experienced delays elsewhere in the appellate process.

The following is a brief synopsis of our opinion, which begins with the issue of exhaustion. We conclude that there is a rebuttable presumption that the State's process is not effective and, therefore, need not be exhausted, if a direct criminal appeal has been pending for more than two years without final action by the State. This two-year presumptive period is not inflexible: the particular circumstances of a case may warrant excusing exhaustion after a delay of less than two years as, for example, when the length of the sentence is considered or when there is an obvious and massive breakdown in the procedural development of the appeal; alternatively, circumstances may warrant refusing to excuse exhaustion even after a delay of more than two years.

Next, we consider whether appellate delays also gave rise to independent due process violations. We apply the four-part balancing test of *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972), and examine the length of the delay, the reason for the delay, whether the peti-

---

1. The Public Defender is the predecessor in interest to the Oklahoma Indigent Defense System (OIDS), which came into being in July 1991. We will refer to both as the Public Defender.

tioner asserted his or her right to a timely appeal, and whether the petitioner experienced any prejudice as a result of excessive delay.

First, we agree with the district court's conclusion that delay in finally adjudicating a direct criminal appeal beyond two years is presumptively excessive. Again, this two-year presumptive period is not inflexible; delay of less than two years may be excessive in some cases and delay of more than two years may not be excessive in other cases. Generally, however, the longer delay in the appellate process extends beyond two years, the less showing a petitioner must make on the other parts of the balancing test, including prejudice resulting from the delay.

Second, we conclude that the reasons the State has offered for the delays experienced by petitioners—underfunding and, possibly, mismanagement of resources—are not constitutionally sufficient to justify excessive delay. Third, we conclude that absent a showing that a petitioner affirmatively sought or caused delay in adjudicating his or her appeal, a petitioner sufficiently asserted his or her right to a timely appeal by filing a federal habeas petition seeking relief from appellate delay by the State.

Finally, we conclude that although prejudice may be presumed if appellate delay is sufficiently excessive, ordinarily a petitioner must make some particularized showing of prejudice to establish a due process violation. Prejudice arising from excessive appellate delay may take any of three forms: oppressive incarceration pending resolution of the appeal; anxiety and concern pending resolution of the appeal; and impairment of the grounds for appeal or the grounds for a retrial in the event the petitioner's conviction is reversed. Because we are concerned only with prejudice arising from excessive delay, the particularized showing must relate to events that occurred during the period of delay that was excessive.

The most significant form of prejudice, and often the most difficult to prove, is prejudice to the grounds for appeal or to the grounds for defense in the event of a retrial. As a precondition to establishing the latter, a petitioner must assert a colorable state or federal claim that would warrant a reversal and retrial. Likewise, as a precondition to establishing either oppressive incarceration or anxiety and concern pending resolution of the appeal, a petitioner generally must assert a colorable claim that would warrant a reversal of his or her conviction or a reduction in sentence that would entitle the petitioner to immediate release. Because the district court has not yet conducted the individualized factual inquiry necessary to apply the *Barker* balancing test to each petitioner, we remand the due process claims to the district court for further development.

Likewise, although we recognize that the Equal Protection Clause may be implicated if indigent petitioners face substantial delays in adjudicating their direct criminal appeals that petitioners who can afford to retain counsel do not face, we cannot review petitioners' equal protection claims on the factual record before us. Therefore, we must remand these claims to the district court, as well.

Turning to petitioners' claims for ineffective assistance of counsel, we conclude that excessive delay in filing an appellate brief may violate a petitioner's right to effective counsel. The violation ends, however, once the brief is filed, and unless the delay affected the outcome of the appeal itself, the past violation is not redressable through a habeas action. Therefore, only when a brief has yet to be filed can a petitioner obtain habeas relief for ineffective assistance of counsel resulting from excessive delay in filing an appellate brief.

Finally, we address two issues that do not relate to delay in the state appellate process. The first concerns the refusal of Judge Brett, one of the members of the district court panel that issued the rulings subject to appeal, to recuse himself from the habeas claims despite his uncle's presence on the Oklahoma Court of Criminal Appeals until the uncle's death in early 1993. We conclude that Judge Brett abused his discretion in failing to recuse himself and that he should not participate in any further proceedings relating to petitioners' claims. We further conclude, nonetheless, that Judge Brett's fail-

ure to recuse himself was harmless error under the particular circumstances presented here and, therefore, we may review the merits of the district court's rulings. Lastly, we conclude that the district court did not abuse its discretion in refusing to award petitioners interim attorney fees on the ground that the fee request was premature.

## I. HISTORICAL & PROCEDURAL BACKGROUND

In 1981, following a two-year pilot project, Oklahoma instituted its first statewide system of public defenders. Before that time, in all but Tulsa and Oklahoma Counties, indigent criminal defendants were represented solely by appointed members of the private bar. The Oklahoma Appellate Public Defender System was given responsibility for appeals by all indigent defendants except those in Tulsa and Oklahoma Counties, who continued to be represented by county public defenders. Except for cases involving conflicts of interest, the Public Defender had no authority to refuse cases assigned to it by the courts.

Beginning in the mid–1980s, the Public Defender was assigned a steadily increasing number of felony appeals. This increase in caseload was not met with a corresponding increase in funding and staffing, however, and a backlog of unbriefed cases began to develop. With only five attorneys briefing noncapital cases, the Public Defender fell further and further behind. At the end of fiscal year (FY) 1986, the Public Defender had a total of 367 unbriefed cases.[2] By the

end of FY 1989, that number had risen to 705.

In an effort to maximize the use of its limited resources, the Public Defender implemented a "first-in, first-out" policy, pursuant to which the oldest cases were briefed first. The Public Defender also began seeking lengthy extensions from the Oklahoma Court of Criminal Appeals on a routine basis. The Public Defender would ask for an initial extension of 360 days to be followed, if necessary, by subsequent requests for extensions of 180 days or less. The Oklahoma Court of Criminal Appeals ordinarily granted these extensions.[3]

Although the Oklahoma Court of Criminal Appeals was distressed by the Public Defender's inability to handle the number of cases assigned to it, the court felt it had no power to remedy the situation directly.[4] In response to a mandamus petition by an indigent criminal defendant who sought an order directing the Public Defender to file appellate briefs in his two cases with no further delays, the Oklahoma Court of Criminal Appeals regretfully commented:

It is obvious that the office is understaffed to handle the number of appeals that are presently being handled by the office but due to the lack of funding by the State, the office is apparently doing the best that they can under the circumstances. We are powerless to cure this problem. It can only be cured by the legislature through the use of its budgetary powers. Petitioner is not entitled to have his appeal handled prior to others who are in similar

---

2. The Public Defender's fiscal year runs from July 1 of the named year through June 30 of the following calendar year.

3. Judge Lumpkin, the Presiding Judge of the Oklahoma Court of Criminal Appeals, testified that the Oklahoma Court of Criminal Appeals decided that granting extensions of time to the Public Defender was preferable to the alternative of reviewing appeals without the benefit of briefs on behalf of the appellants. He explained that, under the court's rules, if a case were submitted with no brief, it would be reviewed for fundamental error only. The Oklahoma Court of Criminal Appeals thought that reviewing cases without the benefit of briefs from the Public Defender would likely lead to the indigent appellants filing motions for post-conviction relief

based on ineffective assistance of counsel. Because granting a new appeal on the basis of ineffective assistance of counsel would only send the indigent appellant back to the bottom of the pile at the Public Defender's Office, the court determined that the indigent appellants would best be served by waiting for the Public Defender to file its briefs, however tardy. Apparently neither the Public Defender nor the Oklahoma Court of Criminal Appeals considered releasing the indigent appellants pending resolution of their appeals.

4. The Oklahoma Court of Criminal Appeals attempted to remedy the problem indirectly by repeatedly asking the legislature to provide more funds.

circumstances and have been delayed even longer.

*Manous v. State,* 797 P.2d 1005, 1005–06 (Okla.Crim.App.1990). Enter Anthony Jerome Harris.

Harris was sentenced on September 29, 1988, and the Public Defender was appointed to represent him on appeal. On April 16, 1990, in response to his inquiry, the Public Defender sent Harris a letter stating: " 'It will be at least 3 years before we are able to file your brief with the court.' " *Harris I,* 938 F.2d at 1064 (quoting Letter from Public Defender to Harris of 4/16/90). Believing that he should not have to wait that long to obtain a review of his conviction and sentence, Harris filed a habeas petition in federal district court and argued that the anticipated delay in adjudicating his direct criminal appeal should excuse his failure to exhaust his state remedies.

By the time we issued our opinion in *Harris I* on June 17, 1991, almost three years had passed since Harris' sentencing and the Public Defender had yet to file a brief on his behalf. We concluded that the briefing delay, which was authorized by the numerous extensions granted by the Oklahoma Court of Criminal Appeals, was attributable to the State and was not justified. Therefore, we excused Harris from exhausting his state remedies before proceeding in federal court. We also noted that the delay raised potential independent violations of Harris' constitutional rights, namely the right to equal protection, the right to due process, and the right to effective assistance of counsel.

We reversed the district court's dismissal of the habeas petition for failure to exhaust and, in light of the problems encountered by Harris and other Oklahoma habeas petitioners who had raised the issue of delay to this court, we directed the district court on remand

> to consider this petitioner's claims within the context of the systemic operations of the [Public Defender]. Once the constitutional scope of the problem is known, the district court should consider what relief is appropriate for this petitioner as well as such systemic relief, if any, as may be needed to prevent any ongoing constitu-

> tional violations that may be occurring as a result of the inability of the [Public Defender] timely to prepare appeals for [its] indigent clients.

*Harris I,* 938 F.2d at 1071 (footnote omitted). Further, we instructed the district court (1) to consolidate, to the extent possible, any other habeas cases pending in the Northern District of Oklahoma that raised a constitutional challenge to the delay by the Public Defender in filing briefs in direct criminal appeals and to coordinate its review of those petitions with the review of similar petitions by the courts in the Western and Eastern Districts of Oklahoma; (2) to "conduct a full hearing, as expeditiously as possible, into possible systemic delays of the [Public Defender] in preparing and filing appellate briefs for [its] indigent clients;" (3) to make "detailed findings of fact and conclusions of law and ... enter orders specifically addressing and remedying any constitutional violations that may be found;" and (4) "to appoint experienced counsel to represent the petitioners" in the collective cases. *Id.* at 1071, 1073.

Two months later, we considered an appeal by another state habeas petitioner who was represented by the Public Defender in his direct criminal appeal. The opening brief there was not filed until two years and nine months after the notice of appeal. *Hill,* 942 F.2d at 1495. At the time we issued our decision, Hill's appeal had been pending three years and four months with no decision by the Oklahoma Court of Criminal Appeals. Hill contended that the delay in adjudicating his appeal excused his failure to exhaust state remedies and violated his right to due process.

Based on our decision in *Harris I,* we reversed the district court's dismissal of Hill's habeas petition for failure to exhaust. On remand, we instructed the district court to consolidate Hill's habeas action with that of Harris for hearing. We further instructed the district court to consider the period both before and after the Public Defender filed its brief and to determine "what part of the whole period of delay caused by the state may have violated Hill's right to due process." *Id.* at 1496–97. We thereby expand-

ed the scope of inquiry on remand to excessive delay in the entire Oklahoma criminal appellate system.

During this time, sweeping changes were taking place in Oklahoma's public defender system. In June 1990, the Oklahoma Supreme Court ruled that Oklahoma's system for appointing and compensating trial counsel for indigent defendants was unconstitutional. *State v. Lynch*, 796 P.2d 1150, 1159 (Okla. 1990).

In its 1991 session, the Oklahoma legislature responded to the *Lynch* decision by overhauling the entire indigent defense system, both at the trial and appellate levels. The Oklahoma Indigent Defense Act, Okla. Stat. tit. 22, §§ 1355–68, which took effect on July 1, 1991, created the Oklahoma Indigent Defense System, and assigned it the responsibility of providing both trial and appellate counsel, as well as counsel on capital post-conviction matters, for indigent defendants in all but Tulsa and Oklahoma Counties. The legislature also authorized the Public Defender to hire two more attorneys to handle noncapital felony appeals.

Pursuant to our remand order in *Harris I*, in July 1991, judges in the three federal districts in Oklahoma began identifying pending habeas cases that raised the issue of delay by the Public Defender and transferring them for hearing to the then-Chief Judge of the Northern District of Oklahoma, who was designated to sit in all three judicial districts. In January 1992, the district court appointed counsel to represent the petitioners in these cases (the *Harris* group), which at that time numbered sixteen.

On February 28, 1992, the petitioners in the *Harris* group, which then consisted of thirty habeas cases, presented the court with reams of statistical and other data gathered from the Public Defender, the Oklahoma Court of Criminal Appeals, and the Attorney General. This evidence showed that for non-capital felony appeals filed in 1989, the Public Defender filed only three percent of its briefs within six months of the date they were due; fifty-six percent of its briefs were at least three years late; and thirty-one percent of its briefs had yet to be filed by the beginning of 1992. Almost all the Public Defender briefs due in noncapital felony appeals filed in 1990 and 1991 had yet to be filed by the beginning of 1992. During much of the operative period, therefore, an indigent appellant could expect a delay of two to four years before his or her appellate brief would be filed.

The Public Defender was not the only entity having problems managing its caseload, however. The Oklahoma Court of Criminal Appeals also had a steadily growing backlog of cases.[5] Each year the court was struggling to dispose of the cases pending from the previous year and was making virtually no progress on the new cases filed that year. At the end of FY 1989, there were 1,148 undecided cases pending before the Oklahoma Court of Criminal Appeals; a year later, there were 1,407 undecided cases pending.[6] Even the Attorney General was beginning to slip. Data collected from the Oklahoma Court of Criminal Appeals showed that although the Attorney General filed almost all her briefs within six months of the due date, starting in 1987, there was "a clear trend of a decreasing number of briefs timely filed." R., Doc. 27, Ex. 3(b) at 12. It was clear from the evidence presented that the appellate criminal justice system in Oklahoma was in a crisis.

In the spring of 1992, the Oklahoma legislature began taking steps to alleviate the crisis. It appropriated $400,000 for the Public Defender to use to contract with private

---

5. The Oklahoma Court of Criminal Appeals has jurisdiction over all criminal appeals in Oklahoma. Every person convicted of a crime in Oklahoma has an appeal as of right to the Oklahoma Court of Criminal Appeals, which is the only appellate court in the state that hears criminal matters. There is no intermediate court and the Oklahoma Supreme Court hears only civil matters. Five judges make up the Oklahoma Court of Criminal Appeals. Decisions are circulated to all five judges for signature, and cannot be issued until at least three of the five judges concur.

6. The Oklahoma Court of Criminal Appeals' fiscal year runs from July 1 of the previous calendar year through June 30 of the year stated. In later documentation submitted to the district court, the number of pending cases at the end of FY 1990 was reported to be 1,533.

attorneys to handle noncapital felony appeals on which the Public Defender had been appointed. As a result, the Public Defender contracted out approximately 176 of its cases that spring. In the fall, the Oklahoma Court of Criminal Appeals also took steps to speed up the appellate process. The court adopted a summary opinion format to be used in all cases that would not be published. By reducing the amount of legal analysis and discussion set forth in its unpublished opinions, the court eliminated lengthy conferences concerning the precise wording of the opinion, as well as the need for separate opinions when judges concurred in the outcome but not in the analysis.

Meanwhile, the petitioners in the *Harris* group, which by then had grown to 108 habeas cases, increased their pressure on the State by filing a supplemental and amended complaint that named as defendants the State of Oklahoma, the Oklahoma Court of Criminal Appeals and its individual members, the Public Defender and its board members and administrative officers, as well as all the Oklahoma wardens, among others. The complaint, filed in July 1992, asserted against all the named defendants both habeas claims and claims for damages under 42 U.S.C. § 1983 [7]. The *Harris* petitioners also filed a motion for a preliminary injunction, seeking to enjoin the Oklahoma Court of Criminal Appeals from granting any further extensions of time to the Public Defender, and a motion for partial summary judgment, seeking the release of those petitioners who had been, or reasonably could be expected to be, in custody for 11.7 months or longer without receiving a final adjudication of their appeal.[8]

The district court held a hearing on the pending motions on October 15, 1992, by which time the *Harris* group had grown to 193 habeas cases. The court noted at the outset that all the parties appeared to agree that delays in the Oklahoma criminal appellate system had risen to the level of constitutional violations, and it informed the parties that it rejected the Attorney General's position that only the Oklahoma legislature could provide a remedy for those constitutional violations. The court said it, too, could provide a remedy.

The Public Defender recommended that the court stay its hand because the legislature had appropriated more money for the Public Defender to contract out its cases, and the Public Defender intended to award contracts in an additional 354–400 cases the next morning. The contracts would require all opening briefs to be filed on or before April 30, 1993. The Public Defender stated that once these cases were contracted out to private counsel, the Public Defender could "maintain brief filings on a current basis within the statutor[il]y allotted periods." Tr. 10/15/92 at 37. Counsel for the Oklahoma Court of Criminal Appeals also suggested that the court wait six months to see if the clog in the system would resolve itself. When questioned about appropriate remedies, counsel argued that while release of petitioners during the period of excessive appellate delay might be an appropriate remedy, it would have to be considered on a case-by-case basis. The Attorney General, in turn, also argued that the propriety of any remedy depended on the individual circumstances of each petitioner.

At the conclusion of the hearing, the court noted that, although in the usual situation it would approach petitioners' claims on an individual basis, in light of the unusual circumstances presented, it proposed the following possible remedy: to release any petitioner whose appeal had not been fully briefed and submitted to the Oklahoma Court of Criminal Appeals for decision within fourteen months of the date of conviction. Each petitioner would be released on his or her personal recognizance until the Oklahoma Court of Criminal Appeals issued its opinion; the State could apply for special terms and conditions of release in individual cases. The court gave the parties until October 23 to comment on the proposal and indicated it

---

7. The district court subsequently bifurcated petitioners' habeas and § 1983 claims. We review only the habeas claims in this opinion.

8. The period of 11.7 months was based on the median time, from notice of appeal to decision, required by the United States Court of Appeals for the Tenth Circuit to adjudicate criminal appeals in 1991.

would issue a ruling shortly thereafter. Unfortunately, no ruling ever appeared.

Beginning in January 1993, various *Harris* group petitioners, who were anticipating release, began filing mandamus petitions with us seeking a ruling by the district court. By the end of February, there were seven such mandamus petitions pending, including one filed by counsel on behalf of all the *Harris* group petitioners.

On February 18, 1993, on motion of the Chief Judge of the United States District Court for the Northern District of Oklahoma, approved by the Chief Judges of the Western and Eastern Districts, the Chief Judge of this court entered an order designating a three-judge district court panel to adjudicate common issues of law and fact in all the habeas cases alleging delay in the adjudication of direct criminal appeals in Oklahoma. The panel, which was composed of one judge from each of the three federal districts in Oklahoma, was formed in an effort to resolve uniformly and expeditiously the common issues arising in the approximately 275 habeas cases that by then made up the *Harris* group.

By order entered March 26, 1993 in the mandamus proceedings, we directed the district court panel to show cause why it should not be ordered, among other things, "to enter findings of fact and conclusions of law in the *Harris* cases insofar as those cases seek habeas relief because of delays by the [Public Defender] in preparing and filing briefs in petitioners' direct criminal appeals" no later than May 10, 1993; and "to enter findings of fact and conclusions of law in the *Harris* cases insofar as those cases seek habeas relief because of delays by the [Attorney General] or the [Oklahoma Court of Criminal Appeals]" no later than September 10, 1993. *Harris v. United States Dist. Ct.*, Nos. 93–527, et al., at 7–8 (10th Cir. Mar. 26, 1993) (unpublished order). We also suggested that the district court certify those rulings for immediate appeal pursuant to Fed.R.Civ.P. 54(b).

In its response to the show cause order, the district court indicated that it had no objection to meeting the deadlines set forth in the show cause order. Therefore, on April 22, 1993, we entered a mandamus order directing the district court to enter the findings and conclusions requested in our show cause order and we also instructed the court to consider the issue of cumulative delay in its ruling due September 10.

On April 1, 1993, the *Harris* group petitioners filed a motion to disqualify two of the three members of the district court panel. Both motions were orally denied at a status conference on April 6, with the exception that Judge Thomas R. Brett, whose uncle was a member of the Oklahoma Court of Criminal Appeals until his death three months earlier, agreed to recuse on any claims for damages.

At an evidentiary hearing on April 9, the district court said it would grant respondents' motion to sever from the *Harris* group twenty-six habeas cases by petitioners who were not represented by the Public Defender in their direct criminal appeals. The court also said that it would close the *Harris* group as of that date and any subsequent habeas petitions raising the issue of appellate delay would be considered on an individual basis. As of April 9, 284 habeas petitions that raised the issue of appellate delay in the Oklahoma criminal justice system had been filed by criminal defendants represented by the Public Defender.

On May 6, 1993, the district court entered its findings of fact and conclusions of law concerning delay by the Public Defender and certified its ruling as final for purposes of appeal pursuant to Rule 54(b). Based on the Rules of the Oklahoma Court of Criminal Appeals, the district court concluded that an appellate process that took up to sixteen months from the filing of the notice of appeal through the filing of appellate briefs "would satisfy constitutional concerns." R., Doc. 143 at 21–22. In light of this standard, the court concluded that "there has been inordinate delay attributable to [the Public Defender] in the filing of most of the appellant briefs herein. This delay has thus been systemic." *Id.* at 22. The court determined, however, that to decide whether the inordinate delay by the Public Defender gave rise to any independent due process violations, it would have to balance the factors set forth in *Bark-*

*er v. Wingo,* 407 U.S. at 530, 92 S.Ct. at 2191, which would require the court to consider each habeas petitioner's case individually. The court said it would defer this individual inquiry until after it had entered all the rulings required by our mandamus order of April 22. The court also deferred any rulings on the equal protection and ineffective assistance of counsel issues until it conducts the individual inquiries on due process.

The court further held that any habeas petitioner whose direct criminal appeal had been either affirmed or reversed with prejudice to retrial was not entitled to habeas relief as a result of delay in the appellate process. Finally, the court held that in the future, habeas petitioners would have to exhaust the issue of delay in the Oklahoma Court of Criminal Appeals before raising it in federal court. Petitioners filed their notice of appeal from the district court's order on May 28.

In August, the parties submitted documentary and testimonial evidence to the court concerning delays by the Attorney General and the Oklahoma Court of Criminal Appeals, as well as cumulative delays in the system. Among other things, the court was advised that two pieces of legislation went into effect on July 1 that would speed the appellate process.

The first act established an Emergency Appellate Division of the Oklahoma Court of Criminal Appeals that can be activated whenever more than 100 noncapital felony appeals are at issue and pending in the Office of the Clerk of the Oklahoma Court of Criminal Appeals. Act of June 3, 1993, ch. 292, secs. 2–6, 1993 Okla.Sess.Laws Serv. 1548, 1549–51 (West) (codified at Okla.Stat. tit. 20, §§ 60.-1.–.5). Each emergency appellate panel consists of three trial judges, two of whom must concur in any decision. Okla.Stat. tit. 20, § 60.3. Each panel must dispose of any cases assigned to it or return the cases to the Oklahoma Court of Criminal Appeals for resolution within ninety days. Decisions of the panels are final unless the Oklahoma Court of Criminal Appeals grants a petition for review. *Id.* at § 60.1. Judge Johnson of the Oklahoma Court of Criminal Appeals testified that sixty-six cases had been assigned to

emergency appellate panels since the legislation went into effect, and three of the cases had already been decided.

The second act cut in half the time allowed for perfecting appeals in misdemeanor and felony cases (*i.e.,* filing the record with transcripts); an appeal must be perfected in 90, rather than 180, days from the date the judgment and sentence are pronounced. Act of June 7, 1993, ch. 298, sec. 5, 1993 Okla. Sess.Laws Serv. 1562, 1564 (West) (codified at Okla.Stat. tit. 22, § 1054). Because the briefing schedule does not begin to run until the appeal has been perfected, reducing the time permitted for perfecting the appeal effectively reduces delay on appeal by ninety days.

The district court entered its findings of fact and conclusions of law concerning delay by the Attorney General and the Oklahoma Court of Criminal Appeals, as well as cumulative delay throughout the appellate system, on September 8, 1993. The court found that pursuant to data provided by the parties, "there are approximately 302 matters now considered *Harris* cases as of August 13, 1993." R., Doc. 255 at 4. An appellate brief had been filed on behalf of the appellant in at least 301 of the cases and the Attorney General had filed a brief on behalf of the appellee in all but three cases. The Attorney General's briefs were filed within the statutory period in 130 cases and were filed more than sixty days after the statutory period in only sixty-seven cases. The Oklahoma Court of Criminal Appeals had issued opinions in eighty-five of the cases, and 217 cases remained pending before the court. Of those, six were not yet at issue, 125 were at issue and ready to be assigned to a judge, and eighty-six were at issue and had already been assigned to a judge.

The district court found no evidence of systemic delay in filing briefs by the Attorney General and also determined that although delay by the Oklahoma Court of Criminal Appeals may have been inordinate in individual cases, it had not been systemic. The court further concluded that there was no cumulative inordinate systemic delay at present. The court held that a delay in adjudicating an appeal of more than two

years from the notice of appeal or order permitting an appeal out of time to issuance of an opinion would be presumed to be unconstitutional "absent a showing of good and sufficient cause or special circumstances." *Id.* at 8. The court again ruled that before a habeas petitioner could assert unconstitutional delay in federal court, he or she first had to raise the issue to the Oklahoma Court of Criminal Appeals and permit it to take appropriate action.

On September 28, petitioners filed their notice of appeal from the court's September 9 order, which the court certified as final pursuant to Rule 54(b). The two appeals were consolidated by our order of October 14, and we heard oral argument in the appeals on November 8, 1993.

On appeal, petitioners assert that the district court's findings and conclusions concerning their due process, equal protection, and ineffective assistance of counsel claims are incomplete and, in certain instances, erroneous. Petitioners also contend that Judge Brett, who was a member of the three-judge district court panel, should have recused himself on the habeas claims pursuant to 28 U.S.C. § 455. Finally, petitioners maintain that the district court erred in not awarding interim attorney fees against the State for work performed by counsel on behalf of petitioners. We will discuss each of these issues below.

## II. ISSUES ON APPEAL RELATING TO DELAY

### A. *Exhaustion of State Remedies*

■ A threshold question that must be addressed in every habeas case is that of exhaustion. Federal habeas relief is not available to a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b).

The exhaustion doctrine, which was codified in 1948, began as "a judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement.'" *Braden v. 30th Judicial Cir. Ct. of Ky.*, 410 U.S. 484, 490, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973) (quoting *Secretary of State for Home Affairs v. O'Brien*, [1923] A.C. 603, 609 (H.L.)). Although the doctrine advances several interests, *see Deters v. Collins*, 985 F.2d 789, 794 (5th Cir.1993), it "is principally designed to protect the state court's role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Id.* (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950)).

■ Exhaustion is, therefore, based on principles of comity; exhaustion is not jurisdictional. *Patterson v. Leeke*, 556 F.2d 1168, 1170 (4th Cir.), *cert. denied*, 434 U.S. 929, 98 S.Ct. 414, 54 L.Ed.2d 289 (1977). "Although there is a strong presumption in favor of requiring the prisoner to pursue his available state remedies, his failure to do so is not an absolute bar to appellate consideration of his claims." *Granberry v. Greer*, 481 U.S. 129, 131, 107 S.Ct. 1671, 1674, 95 L.Ed.2d 119 (1987). The State may waive a prisoner's failure to exhaust by failing to raise the defense in federal district court. *Id.* at 135, 107 S.Ct. at 1675. Likewise, some cases may present special circumstances that make it "appropriate for an appellate court to address the merits of a habeas corpus petition notwithstanding the lack of complete exhaustion." *Id.* at 131, 107 S.Ct. at 1673; *Frisbie v. Collins*, 342 U.S. 519, 521, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952). One such circum-

stance is when the State's process is inadequate to protect a prisoner's rights. *See* 28 U.S.C. § 2254(b); *Darr,* 339 U.S. at 210, 70 S.Ct. at 593.

"[W]here state procedural snarls or obstacles preclude an effective state remedy against unconstitutional convictions, federal courts have no other choice but to grant relief in the collateral proceeding." *Bartone v. United States,* 375 U.S. 52, 54, 84 S.Ct. 21, 22, 11 L.Ed.2d 11 (1963); *see also Hankins v. Fulcomer,* 941 F.2d 246, 250 (3d Cir.1991) ("[T]he principle of comity weighs less heavily [when] the state has had an ample opportunity to pass upon the matter and has failed to sufficiently explain its ... delay."); *United States ex rel. Hankins v. Wicker,* 582 F.Supp. 180, 182 (W.D.Pa.1984) ("If an appropriate remedy does not exist or its utilization is frustrated in the state system, ... [t]he deference accorded the state judicial process must give way to the primary role of the federal courts to redress constitutional deprivations."), *aff'd,* 782 F.2d 1028 (3d Cir.) (table), *cert. denied,* 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64 (1986).

■ Thus, "inexcusable or inordinate delay by the state in processing claims for relief" may make the state process ineffective to protect the petitioner's rights and excuse exhaustion. *Wojtczak v. Fulcomer,* 800 F.2d 353, 354 (3d Cir.1986); *accord Hill v. Reynolds,* 942 F.2d at 1496 ("[T]he delay [petitioner] faced in having a direct appeal filed proves his state remedies ineffective.").

In *Way v. Crouse,* 421 F.2d 145, 146–47 (10th Cir.1970), we concluded that it was proper for a habeas petitioner who had experienced an eighteen-month delay in the adjudication of his direct criminal appeal to "seek vindication of his asserted constitutional grievance" in the federal, rather than the state, courts. Noting that " '[t]he concept of federal-state comity involves mutuality of responsibilities, and an unacted upon responsibility can relieve one comity partner from continuous deference,' " we vacated the order dismissing the habeas petition for failure to exhaust. *Id.* at 147 (quoting *Dixon v. Florida,* 388 U.S. 424, 426 (5th Cir.1968)).

■ Later, in *Harris I,* we set forth the standard that when "a habeas petitioner makes colorable and sufficient allegations of an unconstitutional delay in obtaining direct state appellate review of his criminal conviction, ... the federal district court should consider that claim on the merits without requiring that he exhaust his direct state appeal first." 938 F.2d at 1068–69. Because exhaustion is a threshold issue, it often can be addressed on the pleadings without the need for an evidentiary hearing. However, an evidentiary hearing was deemed necessary in *Harris I* to investigate the reasons for delay in light of the allegations of systemic delay.

We turn now to the question: At what point does delay in the state process become so inordinate that exhaustion should be excused? In addressing this question, we must keep in mind that "[i]t is the legal issues that are to be exhausted, not the petitioner," *Park v. Thompson,* 356 F.Supp. 783, 788 (D.Haw. 1973). We cannot, of course, announce a bright line rule. As we noted in *Way,* 421 F.2d at 146–47, and *Jones v. Crouse,* 360 F.2d 157, 158 (10th Cir.1966), it is necessary to know the facts and circumstances surrounding the delay in order to determine whether the State is providing the petitioner an effective appeal.

In *Way,* we concluded that an eighteen-month delay in docketing a direct appeal before the state supreme court was enough to excuse exhaustion in the absence of facts and circumstances justifying that delay. 421 F.2d at 146–47. Based on other facts and circumstances, courts have found other periods of delay sufficient to conclude that the state process was ineffective and exhaustion should be excused. *See Simmons v. Reynolds,* 898 F.2d 865, 870 (2d Cir.1990) (suggesting that "[t]he doctrine of exhaustion of state remedies does not require a prisoner to wait ... three or four years before enlisting federal aid to expedite an appeal"); *Rheuark v. Wade,* 540 F.2d 1282, 1283 (5th Cir.1976) (remanding for district court to excuse exhaustion if fifteen-month delay in preparing transcript could not be justified); *Dozie v. Cady,* 430 F.2d 637, 638 (7th Cir.1970) (remanding for district court to excuse exhaus-

tion if seventeen-month delay in briefing direct criminal appeal could not be justified); *United States ex rel. Hankins,* 582 F.Supp. at 182 (finding "the twenty four month delay in the disposition of [petitioner's] direct appeal, to which is added the nine month period between his conviction and the filing of a notice of appeal, sufficient to question the adequacy of the state remedy" and to excuse exhaustion); *cf. Smith v. Kansas,* 356 F.2d 654, 657 (10th Cir.1966) (remanding for district court "to take such steps as it deems necessary to secure petitioner's right to a prompt hearing on his claim of unconstitutional restraint" where more than one year passed between filing of motion for postconviction relief and entry of appealable order), *cert. denied,* 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967); *Breazeale v. Bradley,* 582 F.2d 5, 6 (5th Cir.1978) (excusing exhaustion because state habeas petition had been completely dormant for over one year and the State had offered "no reason for its torpor"); *St. Jules v. Beto,* 462 F.2d 1365, 1366–67 (5th Cir.1972) (remanding for district court to excuse exhaustion and address merits if seventeen-month delay in state trial court ruling on motion for post-conviction relief could not be justified); *Jones,* 360 F.2d at 158 (remanding for district court to excuse exhaustion if eighteen-month delay in adjudicating appeal from denial of post-conviction relief could not be justified); *Dixon,* 388 F.2d at 426 (remanding for district court to excuse exhaustion and address merits if eighteen-month delay in state trial court ruling on post-sentencing motion could not·be justified); *Seemiller v. Wyrick,* 663 F.2d 805, 807–08 (8th Cir.1981) (remanding for district court to excuse exhaustion and address claims if state court had not ruled within sixty days on motion for post-conviction relief that·had been pending for two years); *Wojtczak,* 800 F.2d at 355–56 (excusing exhaustion because motion for post-conviction relief had been pending for more than two and one-half years); *Moore v. Deputy Comm'rs of SCI–Huntingdon,* 946 F.2d 236, 242 (3d Cir.1991) (excusing exhaustion because petition for post-conviction relief had

been pending for three years), *cert. denied,* —— U.S. ——, 112 S.Ct. 1509, 117 L.Ed.2d 647 (1992).

■ Although we cannot establish a bright line, we think it would be helpful to articulate a time period beyond which there is at least a presumption that the state process has become ineffective because of delay. Based upon the record before us, as well as our review of the case law in this and other circuits, we conclude that delay in adjudicating a direct criminal appeal beyond two years from the filing of the notice of appeal gives rise to a presumption that the state appellate process is ineffective.[9]

We recognize that cases may arise in which exhaustion should be excused even though an appeal has been pending for less than two years. Conversely, we also recognize that, in particular cases, the State may show that a delay of more than two years is justified and, therefore, good cause exists for not excusing exhaustion. Thus, we hold only that the state appellate process should be presumed to be ineffective and, therefore, exhaustion should presumptively be excused, when a petitioner's direct criminal appeal has been pending for two years without resolution absent a constitutionally sufficient justification by the State. *See Burkett v. Cunningham,* 826 F.2d 1208, 1218 (3d Cir.1987) (*Burkett I* ) ("[W]here a petitioner has demonstrated inordinate delay, we have placed the burden on respondents to demonstrate why further resort to the state courts should be required.").

■ Although § 2254 requires a habeas petitioner to exhaust his or her underlying claims before coming to federal court, it does not require a petitioner to exhaust the issue of exhaustion, itself. Because exhaustion functions as a federal court gatekeeper, the federal, not the state, courts decide when the state process has been exhausted or should be deemed ineffective because of delay. Moreover, requiring a petitioner to raise the issue of exhaustion first in state court would unnecessarily frustrate a petitioner's right to

---

**9.** When a petitioner has been granted an appeal out of time, the length of the appellate process should be measured from the entry of that order,

unless, of course, delay in perfecting the appeal in the first instance is attributable to the State.

a speedy adjudication of his or her claims. *See Way*, 421 F.2d at 146–47 (conditionally excusing petitioner from having to raise issue of delay to "the very courts which are responsible, on the face of the pleadings, for the very delay of which he complains"); *Brooks v. Jones*, 875 F.2d 30, 31 (2d Cir.1989) ("When the petitioner can substantiate his complaint that his right to appeal is being violated by inattention and time-consuming procedures, to require one more technical step would be to tolerate the frustration of the petitioner's due process rights."); *United States ex rel. Hankins*, 582 F.Supp. at 182 ("[W]here the state process is itself the basis for the claim[ed] denial of due process the issue has properly been presented [to the state judiciary]."). *But see Schandelmeier v. Cunningham*, 819 F.2d 52, 54–55 (3d Cir. 1986) (holding that because petitioner had not pursued procedures for presenting his claims based on sentencing delay to the state court, he had not exhausted his remedies and could not seek federal relief), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1584, 94 L.Ed.2d 774 (1987).

■ Once exhaustion is excused, a federal court has the power to review the merits of a petitioner's habeas petition to the extent that it raises federal issues. *See, e.g., Jones*, 360 F.2d at 158. In many (indeed, most) instances, however, proceeding directly to the merits of a petitioner's claims after excusing exhaustion may not be the preferred course of action, or even an effective one.

If exhaustion is excused due to delay in adjudicating a petitioner's direct criminal appeal, the federal habeas review will, in some regards, serve as a surrogate for a direct state appeal. This raises several concerns. First, because the petitioner would be entitled to appointed counsel on direct appeal, *Douglas v. California*, 372 U.S. 353, 356–58, 83 S.Ct. 814, 816–17, 9 L.Ed.2d 811 (1963), it may be appropriate to appoint counsel to represent the petitioner on habeas review. Likewise, the federal court may need to ensure that an indigent petitioner has a free copy of the trial transcript if it is necessary to evaluate his or her habeas petition. *See Griffin v. Illinois*, 351 U.S. 12, 19–20, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956).

Furthermore, to the extent the petitioner's underlying claims of error are state claims, the federal court cannot review them even if exhaustion is excused, because federal habeas review is limited to alleged "violation[s] of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254; *see also Estelle v. McGuire*, —— U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Finally, federal courts should not be required as a routine matter to fulfill the State's obligation to provide an "adequate and effective" direct criminal appeal to its indigent criminal defendants, *Griffin*, 351 U.S. at 20, 76 S.Ct. at 591. Requiring the federal courts to do so on a regular basis just because the State does not fulfill its own constitutional obligations would unnecessarily tax federal resources and inject the federal courts into the State's process.

■ Thus, we consider an alternative. We start by noting that delay in adjudicating a state prisoner's direct criminal appeal may do more than simply excuse exhaustion. It also may give rise to an independent due process claim. *Harris I*, 938 F.2d at 1068; *accord United States v. Pratt*, 645 F.2d 89, 91 (1st Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); *Cody v. Henderson*, 936 F.2d 715, 719 (2d Cir.1991); *Burkett v. Fulcomer*, 951 F.2d 1431, 1446 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992) (*Burkett II*); *Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981); *Coe v. Thurman*, 922 F.2d 528, 530–31 (9th Cir. 1990). Thus, a habeas petition may be predicated on a due process violation arising from the State's delay in adjudicating a petitioner's direct criminal appeal even if the petitioner's allegations of error at the trial level are based on state law and, therefore, not proper for federal habeas review.

Once appellate delay rises to the level of an independent due process violation, a wide range of remedies is available with which the federal district court can redress the constitutional violation. These remedies often will be more effective in redressing state appellate delay than will merely excusing exhaustion and considering the petitioner's underlying claims on the merits. We turn, therefore, to the requirements for establishing an independent due process claim based on the State's delay in processing a direct criminal appeal.

### B. Substantive Claim That Appellate Delay Violates Right To Due Process

#### 1. Elements of the claim

The Due Process Clause provides that "No person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V. Similarly, the Fourteenth Amendment provides "nor shall any State deprive any person of life, liberty, or property, without due process of law." *Id.* amend. XIV, § 1.

The right to a speedy trial, which is guaranteed an accused by the Sixth Amendment, is a fundamental right imposed on the states by the Due Process Clause of the Fourteenth Amendment. *Barker v. Wingo,* 407 U.S. at 515, 92 S.Ct. at 2184. Although the Constitution does not require the State to afford a criminal defendant a direct appeal to challenge alleged trial court errors, *see McKane v. Durston,* 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed. 867 (1894), the Supreme Court has held that

> if a State has created appellate courts as "an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant," *Griffin v. Illinois,* 351 U.S., at 18 [76 S.Ct. at 590], the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.

*Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985) (alteration in original).

To ensure the defendant's right to a "meaningful appeal," *Douglas v. California,* 372 U.S. at 358, 83 S.Ct. at 817, the Court has held that when the State affords a criminal defendant an appeal by right, the Fourteenth Amendment requires, among other things, that counsel be appointed to represent an indigent defendant *id.* at 356–58, 83 S.Ct. at 816–17, that the representation of counsel be effective, *Evitts,* 469 U.S. at 396, 105 S.Ct. at 836, and that either an indigent defendant be provided a free transcript or some equivalent method of reporting the trial proceedings be employed, *Draper v. Washington,* 372 U.S. 487, 495, 83 S.Ct. 774, 778, 9 L.Ed.2d 899 (1963); *Griffin v. Illinois,* 351 U.S. at 19–20, 76 S.Ct. at 590–591.

We may add to this list the requirement that the State afford the defendant a timely appeal, for an appeal that is inordinately delayed is as much a "meaningless ritual," *Douglas,* 372 U.S. at 358, 83 S.Ct. at 817, as an appeal that is adjudicated without the benefit of effective counsel or a transcript of the trial court proceedings. *See Burkett I,* 826 F.2d at 1221–22; *United States ex rel. Smith v. Twomey,* 486 F.2d 736, 739 (7th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974); *cf. Coppedge v. United States,* 369 U.S. 438, 449, 82 S.Ct. 917, 923, 8 L.Ed.2d 21 (1962) ("No general respect for, nor adherence to, the law as a whole can well be expected without judicial recognition of the paramount need for prompt, eminently fair and sober criminal law procedures.... Delay in the final judgment of conviction, including its appellate review, unquestionably erodes the efficacy of law enforcement."); *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ").

When determining whether a criminal defendant has been deprived of his or her right to timely process at the trial level, the Supreme Court has established a balancing test to be applied on an *ad hoc* basis. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2191. Four factors should be assessed and balanced: "(1) [l]ength of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Id.* (num-

bers added). The fourth factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Id.* at 532, 92 S.Ct. at 2193. The "Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*

■ Although *Barker* addressed only a defendant's Sixth Amendment right to a speedy trial, the balancing test the Court enunciated provides an appropriate framework for evaluating whether a defendant's due process right to a timely direct criminal appeal has been violated. *See Rheuark v. Shaw,* 628 F.2d at 303 ("The factors of *Barker* are preferred [over] the standard announced in *United States v. Lovasco,* 431 U.S. 783 [97 S.Ct. 2044, 52 L.Ed.2d 752] ... (1977) [concerning pre-indictment delay], since the reasons for constraining appellate delay are analogous to the motives underpinning the Sixth Amendment right to a speedy trial.") (footnote omitted); *DeLancy v. Caldwell,* 741 F.2d 1246, 1248 (10th Cir.1984) ("We agree with the Fifth Circuit that the right to avoid unreasonable delay in the appellate process is similar to the right to a speedy trial."); *Burkett II,* 951 F.2d at 1445–46 (holding that delay in adjudicating an appeal, which infringes on due process rights, is effectively no different than delay in imposing a sentence, which infringes on Sixth Amendment speedy trial right).

We can apply the first three factors of the *Barker* test to claims of appellate delay without modification. We must modify the fourth factor of prejudice to the defendant, however, to reflect the interests sought to be protected by an appeal "unencumbered by excessive delay." *Rheuark v. Shaw,* 628 F.2d at 303 n. 8.

The Fifth Circuit has identified the following interests that should be considered when assessing prejudice arising from appellate delay: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Id.* In *DeLancy,* 741 F.2d at 1248, we adopted the Fifth Circuit's modification of the *Barker* prejudice factor for purposes of appellate delay. We also heeded the Supreme Court's admonition that the four factors of the balancing test are related and should be considered together with such other circumstances as may be relevant. *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193; *DeLancy,* 741 F.2d at 1248.

■ Nevertheless, as we discuss below, we view the first factor—length of delay—as a threshold that a petitioner must meet before the court need consider the other factors. Furthermore, we agree with the Ninth Circuit that, ordinarily, a petitioner must make some showing on the fourth factor—prejudice—to establish a due process violation. *United States v. Tucker,* 8 F.3d 673, 676 (9th Cir.1993) (en banc).

Therefore, in determining whether delay in adjudicating a petitioner's direct criminal appeal violated the petitioner's due process rights, we must balance the following factors:

a. the length of the delay;

b. the reason for the delay and whether that reason is justified;

c. whether the petitioner asserted his right to a timely appeal; *and*

d. whether the delay prejudiced the petitioner by

i. causing the petitioner to suffer oppressive incarceration pending appeal; *or*

ii. causing the petitioner to suffer constitutionally cognizable anxiety and concern awaiting the outcome of his or her appeal; *or*

iii. impairing the petitioner's grounds for appeal or his or her defenses in the event of a reversal and retrial.

We will address each of these factors in turn.

### a. *The length of the delay*

The first factor in the balancing test is the length of the appellate delay. "Only passage of an *inordinate* amount of time triggers due process concern[s]." *Hill v. Reynolds,* 942

F.2d at 1497 (emphasis added). Therefore, if a petitioner cannot establish at least some degree of inordinate delay, the court need not inquire into the other factors. *Cf. Doggett v. United States,* —— U.S. ——, —— ——, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520 (1992) (holding that because no speedy trial violation occurs if the government prosecutes a defendant "with customary promptness," "to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay").

We cannot set an inflexible length of time that will constitute inordinate delay in every case. *See Barker,* 407 U.S. at 521, 92 S.Ct. at 2187 ("We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."); *Coe v. Thurman,* 922 F.2d at 531 ("[T]here is no talismanic number of years or months, after which due process is automatically violated."). Nonetheless, it seems appropriate to judge appellate delay by the same two-year presumptive standard that we used earlier to excuse exhaustion. *See supra* at p. 1556. Therefore, a two-year delay in finally adjudicating a direct criminal appeal ordinarily will give rise to a presumption of inordinate delay that will satisfy this first factor in the balancing test.

Creating a presumption that a two-year delay in adjudicating an appeal is inordinate comports with the district court's ruling that "a *two-year* period, from the notice of appeal or order permitting same, be established as the time period for resolution of a direct criminal appeal in Oklahoma beyond which any delay will be presumed to be unconstitutional, ... absent a showing of good and sufficient cause or special circumstances." R., Doc. 255 at 8 (footnote omitted).[10] Respondents do not challenge the district court's two-year presumptive period. Although petitioners argue for a shorter period, the only basis for their argument is that in 1991, the Tenth Circuit's median time for deciding direct criminal appeals was 11.7 months. *See* Appellant's Principal Br. (No. 93–5123) at 57; Appellant's Principal Br. (No. 93–5209) at 18–19. We are not sufficiently persuaded by this single statistic to conclude that the district court erred in establishing a two-year presumptive period. *See United States v. Pratt,* 645 F.2d at 91 (declining to hold nine-month appellate delay unconstitutional in absence of exacerbating factors); *United States ex rel. Harris v. Reed,* 608 F.Supp. 1369, 1376 (N.D.Ill.1985) (holding that a seven-and-one-half-month delay in adjudicating a motion for post-conviction relief was not so egregious as to violate petitioner's due process rights); *Doescher v. Estelle,* 454 F.Supp. 943, 952 (N.D.Tex.1978) (determining as a matter of law that a one-year delay in processing petitioner's appeal was not unjustified), *appeal dismissed,* 597 F.2d 281 (5th Cir.1979) (table).

The district court concluded that two years to adjudicate an appeal in Oklahoma is both customary and feasible.[11] Furthermore, a

---

**10.** We modify the district court's ruling only in one particular. We use the two year period only to presume excessive delay, and not to presume the ultimate issue of unconstitutionality. To reach that ultimate issue, the other prongs of the *Barker* test also must be addressed.

**11.** The district court arrived at the two-year period by taking into account the following time periods permitted for each stage of the appeal under the Rules of the Oklahoma Court of Criminal Appeals, plus reasonable extensions: three (previously six) months to prepare the transcript and record, per Rule 2.3A(2), plus one extension not to exceed sixty days; sixty days to file appellant's brief, per Rule 3.4B, plus one extension not to exceed sixty days; sixty days to file appellee's brief, per Rule 3.4C, plus one extension not to exceed sixty days; and the remainder of the time, consisting of eleven months, to hear and decide the appeal. R., Doc. 143 at 21–22; *id.,* Doc. 255 at 7–8. The district court suggested that delay beyond any of these individual interim times might also create a presumption of inordinate delay that would be subject to redress through habeas corpus. *See id.,* Doc. 143 at 23–24; *id.,* Doc. 255 at 8–9. While we understand the district court's reluctance to require a petitioner whose direct criminal appeal has not progressed in a timely fashion to wait two full years before coming to federal court to seek redress, we think treating each component of the two-year period as a separate presumptive period is ill-advised and would open the federal courts to an unnecessary flood of litigation. Instead, we think the better practice is to recognize that the two-year presumptive period is neither absolute nor inflexible. For example, if unique circumstances dictate the need for a shorter adjudication time, the petitioner may establish that a delay of less than

two-year delay is within the time frame that other courts have found to raise due process concerns. For example, in *United States ex rel. Hankins,* 582 F.Supp. at 184–85, the court held that the pendency of an appeal for two years with no decision by the state appellate court, coupled with a nine-month delay by the trial court in ruling on post-trial motions, gave rise to a prima facie due process violation. *See also Dozie v. Cady,* 430 F.2d at 638 (holding that seventeen-month delay in filing opening brief warranted inquiry into possible due process violation); *Burkett II,* 951 F.2d at 1445–46 (holding that eighteen-month delay between sentencing and decision on appeal gave rise to due process violation); *United States v. Antoine,* 906 F.2d 1379, 1382–83 (9th Cir.) (holding that three-year delay in adjudicating federal appeal was "substantial" and remanding for further findings regarding prejudice), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990); *Snyder v. Kelly,* 769 F.Supp. 108, 111 (W.D.N.Y.1991) (holding

that three years is "an excessive amount of time to await the resolution of an appeal"), *aff'd* 972 F.2d 1328 (2d Cir.1992) (table); *cf. Jones v. Crouse,* 360 F.2d at 158 (holding that delay of more than eighteen months in processing appeal of collateral attack warranted inquiry into possible due process violation).[12]

■ The passage of two years creates only a presumption of inordinate delay on appeal. The particular circumstances of a case may warrant a finding that the passage of less than two years constitutes inordinate delay or that the passage of more than two years does not. For example, although the length of the sentence cannot be a controlling factor in light of the time requirements inherent in processing an appeal, a case in which a very short sentence was imposed may warrant more expedited treatment. *See Wheeler v. Kelly,* 639 F.Supp. 1374, 1379 (E.D.N.Y.1986) (holding that "the length of

two years is inordinate under the circumstances. Similarly, if a substantial amount of time has passed and it appears a petitioner's direct criminal appeal cannot realistically be completed within the two-year period because of inordinate delay in the early stages of the appellate process, the petitioner may seek redress in federal court before the full two years has elapsed.

12. We have searched, with little success, for appellate standards from other jurisdictions to guide us in our analysis of petitioners' claims of appellate delay. We note that the *Standards Relating to Appellate Delay Reduction,* which were established by the Appellate Delay Reduction Committee of the Appellate Judges Conference of the American Bar Association in 1988, provide that all appeals, whether civil or criminal, should be decided within 280 days from the filing of the notice of appeal. *See* Rita M. Novak & Douglas K. Somerlot, American Bar Ass'n, *Delay on Appeal* App. F at 187, 214 (1990).

The ABA standards, which are significantly shorter than the two-year presumption we have created, have been widely criticized as unrealistic, *e.g.,* Honorable Carl West Anderson, *Are the American Bar Association's Time Standards Relevant for California Courts of Appeal?,* 27 U.S.F.L.Rev. 301, 307, 351 (1993); Roger Hanson et al., National Center for State Courts, *Time on Appeal: Beyond Conjecture* 3 (1993), and no court has formally adopted them without modification, Anderson, *supra* at 359.

Only a handful of state courts have adopted appellate time standards, and the time standards adopted vary widely. For instance, a delay re-

duction team in the First Appellate District of the California Court of Appeals has proposed the following standards: for appeals from criminal cases that were disposed of before a trial, the court should process fifty percent of the appeals within 185 days and ninety percent of the appeals within 305 days; and for appeals from criminal cases that were disposed of after a trial, the court should process fifty percent of the appeals within 305 days and ninety percent of the appeals within 475 days. *Id.* at 359, App. H–3. Justice Anderson's "comprehensive search of state appellate rules" revealed that the following standards have been formally adopted by state courts: Florida: "decision within 180 days of oral argument;" Maryland: "decision within 130 days of appeal for jointly-elected, expedited appeals;" New Mexico: "decision within 10 months of appeal." *Id.* at 351 n. 191. Wisconsin has adopted an internal operating procedure providing that "[t]he average time for rendering a decision should not exceed 40 days, and the maximum time for any case, except one of extraordinary complexity, should not exceed 70 days." Court of Appeals of Wisconsin Internal Operating Procedure VI(4)(h). Idaho and Virginia have informally adopted the following appellate standards: Idaho: "written but unpublished administrative goal to decide appeals within 418 to 508 days;" Virginia: administrative goal of decision within 210–295 days of appeal, "depending upon whether a transcript must be prepared and/or the opinion is to be published." Anderson, *supra* at 351 n. 191. There do not appear to be clear remedies for the appellant if any of these time standards are not met.

the sentence is a factor in determining whether post-conviction delay is excessive"), *aff'd*, 811 F.2d 133 (2d Cir.1987). On the other hand, a particularly complex case may warrant a more lengthy appellate process. *Cf. Geames v. Henderson*, 725 F.Supp. 681, 685 (E.D.N.Y.1989) (holding that delay of three-and-one-half years was excessive because issues on appeal were "no more complex than in most criminal appeals").

Because it is a balancing test that we employ, however, delay substantially beyond two years, at least in a case that does not warrant a lengthier appellate process, will reduce the burden of proof on the other three factors necessary to establish a due process violation. *See Doggett*, —— U.S. at ——, 112 S.Ct. at 2693 (holding that the more protracted the delay, the more prejudice may be presumed from the delay).

### b. *The reason for the delay*

The second part of the balancing test is the reason for the delay. In *Harris I*, we laid to rest any argument that delays by the Public Defender in filing briefs could be attributed to petitioners on the ground that the Public Defender requested the continuances on petitioners' behalf. 938 F.2d at 1065. The record indicated that "the delay in preparing petitioner's brief on appeal [was] caused by the inability of [the Public Defender] to address petitioner's case in a timely fashion." *Id.* Because this delay was "forced upon an unwilling petitioner by reason of his indigency," we held it should not be attributed to the petitioner. *Id.* The parties do not dispute that the delays in adjudicating petitioners' direct criminal appeals are attributable to the State of Oklahoma and not to petitioners.[13] *See* R., Doc. 29 at 9 (Attorney General); Addendum to Br. of OIDS Defs. at 17 (Public

Defender); R., Doc. 27, Ex. 3(c), Attachment 1 (Oklahoma Court of Criminal Appeals); *see also Hankins v. Fulcomer*, 941 F.2d at 252 (holding that court had numerous opportunities to rule on pending matters and its delay in doing so was not attributable to petitioner); *Wojtczak v. Fulcomer*, 800 F.2d at 356 (holding that delay in adjudicating motion for post-conviction relief was not attributable to petitioner, but to "disinterest on the part of court appointed counsel and to a failure on the part of the court to require them to provide minimally effective representation").

The State has offered no constitutionally sufficient justification for the delays, such as that the cases are unusually complex or that they involve the death penalty. The only reasons offered by the State were the lack of funding and, possibly, the mismanagement of resources by the Public Defender. *See* R., Doc. 29 at 9; Addendum to Br. of OIDS Defs. at 17; R., Doc. 27, Ex. 3(c), Attachment 1.[14] Neither of these reasons constitutes an acceptable excuse for delay. *See United States ex rel. Smith*, 486 F.2d at 739 ("The rights announced in *Griffin v. Illinois* and *Douglas v. California* cannot be allowed to become meaningless through understaffing of the state offices responsible for assuring those rights.") (citations omitted); *Snyder*, 769 F.Supp. at 111 (holding that the "brobdingnagian case load of assigned counsel" is not an acceptable reason for delay); *Rheuark v. Shaw*, 477 F.Supp. 897, 912 n. 17 (N.D.Tex.1979) ("[T]he constitutional requirements of due process on appeal may not be abridged by failing to fund substitute court reporters."), *aff'd in part, rev'd in part*, 628 F.2d 297 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981); *cf. Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977)

---

**13.** In her March 23, 1992, comments on data submitted by petitioners to the district court, the Attorney General conceded that

whether the delay and backlog are the result of understaffing and underfunding or whether the delay is the result of possible mismanagement of the internal operations and allocation of resources within the [Public Defender] agency, the result is still the same, that the reason for the delay is attributable to [the Public Defender] and not to the Petitioner.

R., Doc. 29 at 9.

**14.** The State did offer an alternative reason for the delay in adjudicating petitioner Doyle King's appeal, which was at issue and pending before the Oklahoma Court of Criminal Appeals for almost seven years without resolution. The State explained that a majority of the members of the Oklahoma Court of Criminal Appeals could not reach agreement on the disposition of the case. R., Doc. 143 at 29; Tr. 4/9/93 at 57. While we appreciate the court's dilemma, its deadlock did not justify the lengthy delay in adjudicating King's appeal.

("[T]he cost of protecting a constitutional right cannot justify its total denial."); *Todaro v. Ward*, 565 F.2d 48, 54 n. 8 (2d Cir.1977) ("Inadequate resources no longer can excuse the denial of constitutional rights.").

### c. *Petitioner's assertion of his or her right to a timely appeal*

The third factor we must balance in determining whether a due process violation has occurred is the petitioner's assertion of his or her right to a timely appeal. The Supreme Court rejected in *Barker* "the rule that a defendant who fails to demand a speedy trial forever waives his right." 407 U.S. at 528, 92 S.Ct. at 2191. Instead, the Court held that whether and how strongly a defendant asserts his or her right to a speedy trial should be balanced with the other factors. *Id.* at 528–29, 92 S.Ct. at 2191.

■ We will not require petitioners to have made an affirmative assertion of their right to a timely appeal in state court for this factor to weigh in their favor. Under the circumstances, the filing of these federal habeas petitions constitutes a sufficient assertion of petitioners' respective rights to a timely appeal. *See Snyder*, 769 F.Supp. at 111.

■ Unlike a criminal defendant who stands accused and may not wish to have any trial, much less a speedy one, *e.g., Barker*, 407 U.S. at 535, 92 S.Ct. at 2194, a criminal defendant who has already been convicted usually wants a speedy appeal and has little or no incentive to delay the outcome. *Cody v. Henderson*, 936 F.2d at 719; *cf. Rose v. Lundy*, 455 U.S. at 520, 102 S.Ct. at 1204 ("The prisoner's principal interest, of course, is in obtaining speedy federal relief on his claims."). Therefore, we presume every petitioner desired a timely appeal.

Furthermore, petitioners were hampered by the fact that they had to speak through their counsel in the state court appellate process and, in most instances, it was that very counsel who was responsible for the

delay. Under these circumstances, we cannot fairly expect petitioners to have raised the issue of delay in state court. *See Gaines v. Manson*, 194 Conn. 510, 481 A.2d 1084, 1093 (1984) ("The petitioners have been handicapped in asserting rights through their counsel when it is the counsel itself that has been the source of the challenged delays.").

■ Moreover, because the Public Defender had a policy of briefing cases on a "first in, first out" basis and the Oklahoma Court of Criminal Appeals was unwilling to expedite the briefing of one Public Defender's case over another, *see Manous v. State*, 797 P.2d at 1005–06, even if petitioners had complained vigorously about delays in prosecuting their appeals, those complaints probably would have been unavailing. *See Gaines*, 481 A.2d at 1093. Therefore, absent evidence that a petitioner affirmatively sought or caused delay in the adjudication of his or her appeal, this third factor should weigh in favor of finding a due process violation.

### d. *Prejudice to the petitioner as a result of delay*

The fourth factor we must consider when determining whether a petitioner's due process rights have been violated is whether the petitioner has suffered any prejudice due to delay in adjudicating his or her appeal. As we stated earlier, prejudice may result from any of the following: (i) oppressive incarceration pending appeal; or (ii) constitutionally cognizable anxiety awaiting resolution of the appeal; or (iii) impairment of a defendant's grounds for appeal or a defendant's defenses in the event of a retrial. *DeLancy*, 741 F.2d at 1248; *Rheuark v. Shaw*, 628 F.2d at 303 n. 8.

We have not previously had occasion to discuss the meaning of prejudice in the context of appellate delay. We take this opportunity to do so, beginning with the last and most serious form of prejudice: impairment of the grounds for appeal or the grounds for defense in the event of a retrial.[15]

---

15. In *Rheuark v. Shaw*, 628 F.2d at 303 n. 8, the Fifth Circuit gave the following example of delay impairing the grounds for appeal. The passage of time made it more difficult for the court re-

porter to read and transcribe the notes of the trial he had taken. As a result, he omitted defense counsel's oral motion for a mistrial. On appeal, the state court refused to rule on an issue

[T]he most serious [form of prejudice] is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Barker,* 407 U.S. at 532, 92 S.Ct. at 2193.

■ Impairment of one's grounds for defense in the event of a retrial is "the most difficult form of ... prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Doggett,* ―― U.S. at ―――-―――, 112 S.Ct. at 2692-93 (quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193). The Supreme Court has recognized that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," *id.* ―― U.S. at ――, 112 S.Ct. at 2693, and the likelihood of injury "increases with the length of the delay," *id.* To support such a finding of prejudice, unjustified delay "unaccompanied by particularized trial prejudice must have lasted longer than [unjustified delay] demonstrably causing such prejudice." *Id.* ―― U.S. at ――, 112 S.Ct. at 2694.

■ That delay has impaired a petitioner's ability to mount a defense on retrial is irrelevant, however, if a petitioner has no credible grounds for reversal and retrial. *See Tucker,* 8 F.3d at 676. Therefore, in addition to establishing that excessive delay has impaired his or her defense on retrial, a petitioner also must assert a colorable state or federal claim that would warrant reversal of his or her conviction.[16] *See id. But see Harris v. Kuhlman,* 601 F.Supp. 987, 994 (E.D.N.Y.1985) (finding that seven-year delay might impair petitioner's defense if he were retried, even though review of petitioner's claims suggested "very little chance of reversal"). Thus, if a petitioner's conviction

has been affirmed by the time the petitioner's claims are heard in the federal habeas proceeding, the petitioner will not be able to show prejudice on retrial because the state appellate court has finally decided there will be no retrial.

■ Likewise, because the only prejudice with which we are concerned is that which arises from *excessive* delay, for a petitioner to make a particularized showing of prejudice, the prejudicial event, such as the death of a key witness, must have occurred, or have been exacerbated, during the period of delay that is found to be excessive. Therefore, in most cases, particularized prejudice that occurs during the first two years that an appeal is pending will not support a due process violation because the prejudice would have occurred even in the absence of any excessive delay in adjudicating the appeal.

■ We turn then to the second type of prejudice: constitutionally cognizable anxiety awaiting resolution of the appeal. Once again, we are concerned only with anxiety arising out of excessive delay. Therefore, that a petitioner is anxious about the outcome of the appeal from the day the notice of appeal is filed is of no consequence; the anxiety must relate to the period of time that the appeal was excessively delayed.

The courts appear split on the showing of anxiety that a petitioner must make. The Ninth Circuit, for example, requires a showing of "particular anxiety" distinguishable from that "of any other prisoner awaiting the outcome of an appeal." *Antoine,* 906 F.2d at 1383; *see also Tucker,* 8 F.3d at 676; *Coe,* 922 F.2d at 532. In *Burkett II,* the Third Circuit concluded that the petitioner had established prejudice in part because he was able "to detail anxiety related to the processing of his case post-conviction." 951 F.2d at 1447. The Second Circuit, on the other hand, has affirmed findings of prejudice based solely on the district court's *assump-*

---

because the record did not reflect any motion for mistrial. *Id.* Although such examples of delay affecting the appeal may exist, they are rare; a petitioner is more likely to be able to establish that delay has impaired the grounds for defense in the event of retrial. Therefore, our discussion focuses on this latter type of prejudice rather

than impairment of the grounds for the appeal itself.

**16.** In determining the issue of prejudice, the federal district court need only address the colorability of the underlying claim and is not required to rule on the merits of the underlying claim.

*tion* that the delay of four or more years worried the petitioner, who awaited hopefully the outcome of the appeal. *Yourdon v. Kelly,* 969 F.2d 1042 (2d Cir.1992) (table), *aff'g,* 769 F.Supp. 112, 115 (W.D.N.Y.1991); *Snyder v. Kelly,* 972 F.2d 1328 (2d Cir.1992) (table), *aff'g* 769 F.Supp. 108, 111 (W.D.N.Y. 1991). We think the better approach is to require the petitioner to make some particularized and substantial showing of anxiety and concern, absent a delay so excessive as to trigger the *Doggett* presumption of prejudice.

 A petitioner has no reason to be anxious or concerned about the time it takes to adjudicate an appeal that is without merit. Therefore, to establish prejudice resulting from anxiety, a petitioner must once again assert a colorable state or federal claim that would warrant reversal of the petitioner's conviction or reduction of sentence to an amount of time less than that taken to adjudicate the appeal.[17]

 The third form of prejudice a petitioner may suffer is oppressive incarceration pending appeal. In many respects this form of prejudice merely duplicates the prejudice of anxiety discussed above. In both cases, the petitioner must make some showing that his or her incarceration is wrongful. In addition, the petitioner must make a particularized showing that the incarceration is oppressive beyond that experienced by others awaiting the outcome of their appeals. That is, the petitioner must show some oppressiveness unique to his or her situation that is directly attributable to the excessive delay in adjudicating the petitioner's appeal.

 While we recognize that a habeas petitioner has a right to assert a properly exhausted habeas claim even if incarcerated

under another, unchallenged sentence, *Sciberras v. United States,* 404 F.2d 247, 249 (10th Cir.1968) (§ 2255); *Rhodus v. Patterson,* 404 F.2d 890, 891 (10th Cir.1968) (§ 2254), incarceration under an *unchallenged* sentence substantially negates a claim of prejudice arising from incarceration under the *challenged* sentence. Because the quality of a petitioner's incarceration may be affected by the very multiplicity of his or her convictions or the seriousness of the offense that is being challenged, however, a petitioner's incarceration under another, unchallenged sentence may not always negate the claim of prejudice altogether.

 Recognizing that proving any of the three forms of prejudice is difficult, we will not require a level of proof that would necessitate a full blown trial simply to determine whether a petitioner suffered actual prejudice as a result of excessive appellate delay. Instead, the petitioner need make only a colorable and particularized showing of prejudice. As we stated earlier, however, regardless of the form the prejudice takes, it must arise during the period of appellate delay that the court finds to be excessive if it is to factor into the *Barker* balancing test.

 The district court determined that it could not evaluate petitioners' due process claims without examining each petitioner's case individually. We agree. While one or more of the factors in the balancing test may weigh the same for every petitioner, not all the factors will. Prejudice, in particular, will vary with the individual. Because the district court has not yet conducted the individual inquiries necessary to resolve petitioners' due process claims, the record is not sufficiently developed for us to review those claims at this time. We therefore remand the action for the district court to conduct

---

**17.** We recognize that the length of sentence imposed may affect not only when a petitioner is subject to release, but the quality of a petitioner's incarceration prior to release. *Cf. Burkett II,* 951 F.2d at 1443 (acknowledging that prejudice may arise from excessive delay that affects the quality of a petitioner's incarceration). Therefore, a petitioner might justifiably suffer anxiety if, for example, he or she had a colorable claim warranting a reduction in sentence that, though not enough to make the petitioner eligible for release before the conclusion of the appeal, was suffi-

cient to affect the quality of the petitioner's incarceration by making the petitioner eligible for a lower level of security or for rehabilitative programs. *See Strunk v. United States,* 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973) (recognizing that "the prospect of rehabilitation" may be adversely affected by delay); *Burkett II,* 951 F.2d at 1443 (finding merit in petitioner's claim that sentencing delay kept him in county jail, where he could not avail himself of rehabilitative programs that would have been available in the state penitentiary).

the necessary inquiry and make an appropriate record for review.[18]

### 2. *Appropriate remedies*

■ If the district court finds that a petitioner's due process rights have been violated, it must then address the matter of a remedy. We agree with the district court's conclusion that any petitioner whose direct criminal appeal has now been decided and whose conviction has been affirmed is not entitled to habeas relief based solely on delay in adjudicating his or her appeal, unless the petitioner can show actual prejudice to the appeal, itself, arising from the delay.[19] *See Muwwakkil v. Hoke,* 968 F.2d 284, 285 (2d Cir.) (holding that once petitioner's state conviction was affirmed, he was not entitled to release unless he could show a reasonable probability that, but for the appellate delay, his appeal would have been decided differently), *cert. denied,* —— U.S. ——, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992).

■ Only when appellate delay "prejudiced [the petitioner's] due process rights so as to make his confinement constitutionally deficient," would habeas relief based on appellate delay be appropriate for a petitioner whose conviction has been affirmed. *Diaz v. Henderson,* 905 F.2d 652, 653 (2d Cir.1990).

> An untainted affirmance of a petitioner's state appeal while his habeas petition is pending makes clear that the petitioner was confined pursuant to a valid judgment of conviction *throughout* the period of delay. The affirmance establishes that if the delay had not occurred and petitioner's due process right to a timely appeal had been fully satisfied, he would have been

subject to exactly the same term of confinement. Because the due process violation did not result in an illegal confinement, it cannot justify granting the habeas remedy of unconditional release.

*Cody,* 936 F.2d at 720.

■ We also agree with the district court that a petitioner whose conviction the state court has reversed with prejudice to retrial is not entitled to federal habeas relief. Because the state court has set such a petitioner's release in motion, federal habeas relief is neither necessary nor available.

"[A]bsent absolute or qualified immunity or other appropriate defenses," a petitioner for whom habeas relief is not available may seek redress from the responsible parties for any due process violation caused by state appellate delay through a claim for damages under 42 U.S.C. § 1983. *DeLancy,* 741 F.2d at 1248; *accord Diaz,* 905 F.2d at 654; *McLallen v. Henderson,* 492 F.2d 1298, 1299–1300 (8th Cir.1974); *Doescher v. Estelle,* 477 F.Supp. 932, 934 (N.D.Tex.1979), *aff'd in part, vacated in part,* 616 F.2d 205 (5th Cir.1980). Because this appeal concerns only petitioners' habeas claims, we will not rule on the implications of any pending § 1983 claims.

■ A petitioner whose direct criminal appeal has not yet been decided, however, is entitled to some form of habeas relief if he or she can establish a due process violation arising from delay in adjudicating his or her state appeal.[20] The most appropriate remedy in these circumstances is to grant a conditional writ, *i.e.,* release the petitioner if the State does not decide the petitioner's appeal

---

**18.** Petitioners contend that the district court's due process rulings are insufficient in several other respects. Based on language in *Harris I,* 938 F.2d at 1071, petitioners assert that the district court should have made findings about how much time the Public Defender can be expected to require in the future to file appellate briefs, as well as the specific reasons for the past delay in filing appellate briefs. Neither of these findings was necessary to the district court's analysis of petitioners' habeas claims, however, and neither is necessary to our review. The remainder of petitioners' challenges to the district court's due process rulings merit no independent discussion.

**19.** Of course, if the State has decided the appeal and affirmed, the State's decision will be conclusive on any state claims. If the federal claims were properly presented in the state proceeding, however, they can then be regarded as exhausted, enabling the federal court to consider them on the merits in the habeas action.

**20.** As of August 13, 1993, 217 criminal appeals by *Harris* group petitioners were still pending before the Oklahoma Court of Criminal Appeals.

within a specified period.[21] *See Harris I,* 938 F.2d at 1070; *Coe,* 922 F.2d at 532–33; *Brooks v. Jones,* 875 F.2d at 32. The district court should order the State to decide the appeal within sixty days—or such other time as the district court decides is appropriate for good cause shown [22]—or release the petitioner.[23]

Although a conditional order of release is the preferred procedure, if the petitioner's underlying substantive claims are federal in nature and, either because of the clarity of the issues or the particular equities involved, the district court concludes that the better procedure would be for it to resolve the federal claims in the absence of exhaustion, the district court has discretion to adjudicate the merits of those claims.[24] As we discussed *supra* at p. 1557, however, because review on the merits by the district court in many regards replicates the petitioner's direct criminal appeal, the district court should consider the appropriateness of appointing counsel for the indigent petitioner, *Douglas,* 372 U.S. at 356–57, 83 S.Ct. at 816, and providing the indigent petitioner a free transcript, *Griffin,* 351 U.S. at 19–20, 76 S.Ct. at 590–91, when reviewing the petitioner's federal claims.

C. *Substantive Claim That Appellate Delay Violates Right To Equal Protection*

"Unfairness results … if indigents are singled out by the State and denied meaningful access to the appellate system because of their poverty." *Ross v. Moffitt,* 417 U.S. at 611, 94 S.Ct. at 2444. In *Harris I,* we noted that delay by the Public Defender in briefing appeals for indigent clients may implicate equal protection concerns. 938 F.2d at 1067;

see also *United States ex rel. Smith v. Twomey,* 486 F.2d at 738; *Gaines v. Manson,* 481 A.2d at 1094. Our informal survey of published Oklahoma Court of Criminal Appeals opinions in *Harris I* suggested that appeals by criminal defendants who were represented by retained counsel were decided considerably faster than appeals by indigent criminal defendants who were represented by the Public Defender. 938 F.2d at 1070 & n. 9.

In its ruling of September 9, 1993, the district court determined the parties did not dispute that criminal defendants in Oklahoma who were represented by private counsel had their appeals decided "in significantly less time" than criminal defendants who were represented by "public appointed counsel." R., Doc. 255 at 11. The court, however, postponed any ruling on petitioners' equal protection claims until it conducts the individual inquiries necessary to resolve petitioners' due process claims.

Determination of petitioners' equal protection claims raises a variety of issues, including the level of scrutiny to be applied. If the State's conduct creates classifications that "impermissibly interfere[ ] with the exercise of a fundamental right or operate[ ] to the peculiar disadvantage of a suspect class" the classifications are subject to strict scrutiny. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam) (footnotes omitted). Absent a classification that interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class, however, the State's conduct need only be "rationally related to a legitimate state interest." *Okla-*

21. If the claims at issue in the direct appeal concern only the length of the petitioner's sentence, then release will be available only after the petitioner has served the uncontested portion of his or her sentence. Furthermore, if the petitioner is serving or has yet to serve another sentence that has not been challenged, "release" from the conviction and sentence being challenged will not actually set the petitioner free.

22. For example, if the briefs have not yet been filed, good cause may exist to give the State more than sixty days to decide the appeal. We note, however, that the district court found in its order

of September 8, 1993, that a brief had been filed on behalf of all but one of the petitioners in their respective direct criminal appeals. R., Doc. 255 at 4.

23. Of course, it will not be necessary to provide the State a time to cure if the due process violation is incurable.

24. In *Harris I,* 938 F.2d at 1071, we addressed other remedies that may be appropriate depending on the particular circumstances of the case.

*homa Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n,* 889 F.2d 929, 932 (10th Cir.1989).[25]

Whether the right to a direct appeal is a fundamental right depends on whether it is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–1297, 36 L.Ed.2d 16 (1973). The Supreme Court has held that "appeals from state criminal convictions are not 'explicitly or implicitly guaranteed by the Constitution,'" and has noted that "in dealing with equal protection challenges to state regulation of the right of appeal in criminal cases [the Court has] applied the traditional rational-basis test." *Estelle v. Dorrough,* 420 U.S. 534, 538, 95 S.Ct. 1173, 1176, 43 L.Ed.2d 377 (1975) (per curiam); *see also McKane v. Durston,* 153 U.S. at 687, 14 S.Ct. at 914 (holding that the Constitution does not require a state to afford a criminal defendant a direct appeal).

While it would appear that the rational basis test applies to petitioners' equal protection claims, the Ninth Circuit has suggested in dicta that when the classification is based on wealth, the right to a direct appeal may be a fundamental right for equal protection purposes. *See United States v. Avendano-Camacho,* 786 F.2d 1392, 1394 (9th Cir.1986); *Bell v. Hongisto,* 501 F.2d 346, 353 (9th Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). *But see Maher v. Roe,* 432 U.S. 464, 471, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977) ("[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis.").

Because the record on appeal is insufficient for us to review petitioners' equal protection claims at this time, we need not decide the proper level of scrutiny to apply to petitioners' claims. Nor need we decide other thorny issues relating to those claims, such as how unequal the appellate processing time for indigents and non-indigents must be to constitute an equal protection violation. *See Ross,* 417 U.S. at 612, 94 S.Ct. at 2444

("The Fourteenth Amendment does not require absolute equality or precisely equal advantages, nor does it require the State to equalize economic conditions.... The question is not one of absolutes, but one of degrees.") (internal quotations and citations omitted); *Gaines,* 481 A.2d at 1094 (holding that the difference in processing appeals of indigents and non-indigents of four years and six months, respectively, "reflects a disparity in opportunity of access to the appellate forum that is constitutionally impermissible"); *Carter v. Thomas,* 527 F.2d 1332, 1333 (5th Cir.1976) (holding that alleged delays of up to twenty-one months between the submission of motions to proceed *in forma pauperis* and the filing of complaints stated an equal protection claim). The district court must address these issues in the first instance on remand.

We note that the district court may not need to reach the equal protection claim in some cases. Because the habeas remedies available to redress an equal protection violation based on appellate delay do not differ from the habeas remedies available to redress a due process violation based on appellate delay, once the court determines that a due process violation has occurred that warrants habeas relief, it need not address the other constitutional issues for purposes of the petitioner's habeas action. Likewise, as we discussed earlier with regard to the due process claims, *see supra* at p. 1566, if the State has upheld the petitioner's conviction on direct appeal, the petitioner is precluded from obtaining habeas relief based on any equal protection violation resulting from delay in adjudicating the petitioner's appeal. In any event, because we have neither the factual record necessary to evaluate petitioners' equal protection claims, nor the benefit of a reasoned analysis of these claims by the district court, we decline to address petitioners' equal protection claims at this time.

D. *Substantive Claim That Appellate Delay Violates Right to Effective Assistance of Counsel*

■ "A first appeal as of right ... is not adjudicated in accord with due process of law

---

**25.** An intermediate level of review exists for "'quasi-suspect' classifications based on characteristics beyond an individual's control, such as gender, illegitimacy, and alienage." *Oklahoma Educ. Ass'n,* 889 F.2d at 932.

if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey,* 469 U.S. at 396, 105 S.Ct. at 836. In the appellate context, the right to effective assistance of counsel requires that counsel "be available to assist in preparing and submitting a brief to the appellate court and ... play the role of active advocate." *Id.* at 394, 105 S.Ct. at 835 (citation omitted).

In *Harris I,* we said that, although a criminal defendant technically may have appointed counsel, "past and future alleged delays may be so great that at some point his [or her] counsel's delay in filing [an] appellate brief either has or will render such assistance ineffective." 938 F.2d at 1068. The courts in the Second Circuit also have acknowledged that delay by counsel in prosecuting an appeal can give rise to a claim for ineffective assistance of counsel. *See Simmons v. Reynolds,* 898 F.2d at 868 (holding that counsel's failure to file a brief for five years constituted ineffective assistance of counsel as a matter of law); *Harris v. Kuhlman,* 601 F.Supp. at 993 ("By any measure, counsel's failure to perfect the appeal [for approximately seven years] must be considered ineffective assistance."); *Yourdon v. Kelly,* 769 F.Supp. at 115 (holding that delay of nearly four years attributable to counsel was sufficiently long to constitute ineffective assistance of counsel as a matter of law); *Williams v. James,* 770 F.Supp. 103, 107 (W.D.N.Y.1991) (holding that delay of two and one-half years, even if attributable to counsel, was not sufficient to constitute ineffective assistance of counsel as a matter of law).

[40–42] To establish a claim for ineffective assistance of counsel, a petitioner must show both that "counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To establish the first of these requirements, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2064. To establish the prejudice requirement, a petitioner usually has to show "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Prejudice will be presumed, however, if the assistance of counsel is actually or constructively denied altogether. *Id.* at 692, 104 S.Ct. at 2067.

Many of the petitioners here have had to wait three or more years just to get their court-appointed counsel to file an appellate brief on their behalf. The district court may well find that delays of this magnitude fall below the prevailing professional standards for providing effective legal assistance. The real question, therefore, is whether the petitioners can prove prejudice as a result of the briefing delay.

During the time that counsel delays excessively in preparing and submitting an appellate brief, the petitioner is left in the same position as someone who has no counsel on appeal at all. *See Evitts,* 469 U.S. at 396, 105 S.Ct. at 836 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all."). Under these circumstances, prejudice is presumed. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. So long as the brief remains unfiled, a petitioner's claim for ineffective assistance of counsel arising from briefing delay may be redressed through a habeas claim. The federal court may direct the State to appoint new counsel to represent the petitioner or otherwise ensure that the petitioner is provided effective assistance of counsel on appeal, and may grant a conditional writ, *i.e.,* order that the petitioner be released if the brief is not filed and the appeal decided within a specified period of time.

Once counsel files an appellate brief, however, counsel's ineffectiveness because of delay ends. *See Simmons v. Reynolds,* 708 F.Supp. 505, 510 (E.D.N.Y.1989), *aff'd* 898 F.2d 865 (2d Cir.1990) (noting that although petitioner was denied effective assistance by counsel who failed to file a brief for six years, petitioner ultimately received effective assistance from new counsel, who filed a brief). Thus, ineffective assistance of counsel arising from delay in filing an appellate brief is

unlike other types of ineffective assistance in that it has a temporal limitation. Furthermore, unlike ineffectiveness arising from, for example, counsel's failure to cross-examine a key witness or to raise a crucial argument on appeal, ineffectiveness arising from delay in filing a brief is unlikely to affect the actual outcome of the appeal.

As we said earlier in the context of due process, *supra* at p. 1566, if a constitutional violation does not affect the integrity of the State's decision, the petitioner's confinement is not unconstitutional. Granting the petitioner habeas relief based on counsel's past ineffective assistance, which has since ended and has not affected the outcome of the appeal, would go too far. Therefore, if an appellate brief has already been filed on the petitioner's behalf at the time the federal court addresses the petitioner's claim of ineffective assistance of counsel arising from delay in filing an appellate brief, the petitioner is not entitled to habeas relief absent a showing that the briefing delay impaired the petitioner's chances of prevailing on appeal.[26] Redress for the past constitutional violation is available, if at all, only through a § 1983 (or other) claim for damages.

In sum, a future habeas petitioner may be able to obtain habeas relief for an ineffective assistance of counsel claim based on counsel's ongoing and excessive delay in filing a brief in the petitioner's direct criminal appeal. Such relief appears to be foreclosed for the petitioners here, however, in light of the district court's finding that an appellate brief has been filed with the Oklahoma Court of Criminal Appeals on behalf of all but one petitioner and our assumption that, by now, a brief has been filed on behalf of this petitioner, as well.

## III. OTHER ISSUES

### A. *Recusal of Judge Brett*

Shortly after the three-judge district court panel was designated to adjudicate common issues of law and fact in these habeas cases, petitioners moved Judge Brett, one of the panel members, to disqualify himself. Petitioners filed a motion pursuant to 28 U.S.C. § 455, in which they noted that among the named defendants in the actions were the Oklahoma Court of Criminal Appeals and the judges thereof, including the Honorable Tom Brett, who was the uncle of United States District Court Judge Thomas R. Brett. R., Doc. 113. In their brief in support of the motion, petitioners recited that "[a]llegations have been made in this case which will require federal judge Thomas R. Brett to review actions in which Tom Brett was involved while sitting on the Oklahoma Court of Criminal Appeals." *Id.*, Doc. 114 at 3. Petitioners expressed their concern that "a decision making process involving a familial relationship between a sitting judge and a defendant presents at least the appearance of possible bias." *Id.*

Judge Brett declined to recuse himself because "in the habeas field ... it's just a matter of reviewing [the] opinions [of the Oklahoma Court of Criminal Appeals]." Tr. 4/6/93 at 101. Judge Brett did agree, however, that though his uncle had died a few months earlier, he should not be involved in any damage claims against his uncle personally. *Id.*

On appeal, petitioners argue that Judge Brett erred in not recusing himself on the habeas, as well as the damage, claims. In light of this error, petitioners request that we set aside any findings or conclusions by the three-judge district court panel that are unfavorable to petitioners. Though we conclude that Judge Brett erred in failing to disqualify himself in light of the allegations at issue in these cases, under the particular circumstances presented, we decline to set aside any findings or conclusions of the three-judge panel on that basis.

---

**26.** Petitioners' claims for ineffective assistance of counsel relate only to briefing delays and are distinct from their due process claims, which relate to delays in the entire appellate process. Although the eventual filing of an appellate brief ends a petitioner's ability to obtain habeas relief on an ineffective assistance of counsel claim arising from delay in briefing the appeal, it does not end a petitioner's ability to obtain habeas relief on a due process claim arising from delay in the entire appellate process. So long as a petitioner's appeal remains undecided, the petitioner may still obtain habeas relief for a due process violation even if counsel has filed a brief on the petitioner's behalf. *See supra* at pp. 1566–67.

Section 455 provides in pertinent part as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

. . . .

(5) He or his spouse, *or a person within the third degree of relationship to either of them*, or the spouse of such person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party[.]

28 U.S.C. § 455 (emphasis added).

 The general purpose of § 455(a) is "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194, 2202 n. 7, 100 L.Ed.2d 855 (1988). Thus, the section is designed to eliminate "even the appearance of impropriety whenever possible." *Id.* at 865, 108 S.Ct. at 2205. Pursuant to § 455(a), "a judge has a continuing duty to recuse before, during, or in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 992 (10th Cir.1993). The standard under § 455(a) is an objective one, and requires recusal whenever "a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Id.* at 993 (further citation omitted). Here, petitioners' habeas and civil rights claims require the district court not only to review the opinions of the Oklahoma Court of Criminal Appeals, but also to decide whether that court participated in, or at least authorized, alleged violations of petitioners' constitutional rights. Therefore, under § 455(a) Judge Brett should have recused himself.

"[Section] 455(b) is stricter than § 455(a) and is concerned with situations that may involve actual bias rather than § 455(a)'s concern with the public perception of the judicial process." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1527 (11th Cir.1988), cert. denied, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). It requires recusal if the judge bears a third degree relationship, or closer, with a party to the suit. Here, although Judge Brett's uncle had died by the time Judge Brett was assigned to these cases, his uncle is, nonetheless, a named party in this action. Therefore, recusal under § 455(b) was required.[27]

 A conclusion that Judge Brett should have recused himself does not, however, end our inquiry. "Although § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. . Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." *Liljeberg*, 486 U.S. at 862, 108 S.Ct. at 2204. Thus, the Supreme Court, noting that "[t]here need not be a draconian remedy for every violation of § 455(a)," has held that a judge's violation of § 455(a) may be harmless error that does not warrant setting aside the judge's previous rulings. *Id.* at 862, 864, 108 S.Ct. at 2204. Several circuits have extended the Supreme Court's harmless error analysis to violations of § 455(b), *see Poloroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1420–21 (Fed.Cir.), cert. denied, 490 U.S. 1047, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989); *Parker*, 855 F.2d at 1527–28, and we are persuaded by their reasoning. Therefore, we will apply a harmless error analysis to Judge Brett's violations of § 455.

In deciding whether a violation of § 455 is harmless error, the Supreme Court has directed us to consider "the risk of injustice to the parties in the particular case, the risk

---

27. On December 27, 1993, the district court dismissed Judge Brett's uncle from this habeas action because he is not the custodian of any petitioner. *See Mackey v. Gonzalez*, 662 F.2d 712, 713 (11th Cir.1981). The district court also dismissed the § 1983 claims against Judge Brett's uncle on the ground that he is absolutely immune from damages liability. *See Snell v. Tunnell*, 920 F.2d 673, 686 (10th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991).

that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg,* 486 U.S. at 864, 108 S.Ct. at 2205.

■ We begin our consideration of these factors by noting the following pertinent facts. First, the very issue involved in the three hundred cases before the district court is that of delay in reviewing petitioners' claims. Although petitioners' claims relate only to delay by the State of Oklahoma, we are ever mindful of the fact that further delay by the federal courts will only exacerbate petitioners' injuries. Second, the facts before the district court were, for the most part, undisputed. Thus, the district court panel was not called upon to make credibility determinations or to make findings on disputed facts that would later be subject to review for clear error only. *See Heins v. Ruti–Sweetwater, Inc. (In re Ruti–Sweetwater, Inc.),* 836 F.2d 1263, 1266 (10th Cir.1988). The panel's legal conclusions are subject to de novo review, *see id.,* which we have done. Third, this case presents the very unusual situation that Judge Brett did not act alone, but rather as one member of a three-judge panel that ruled unanimously on the issues presented.[28] Finally, we note that Judge Brett's uncle did not act alone, either, but rather as one member of a five-judge court.

Keeping these pertinent facts in mind, we consider the risks that may attend reviewing the panel's rulings on the merits, rather than vacating the district court's orders to permit an entirely new proceeding, untainted by the conflict.[29] First, reviewing the district court's decisions as they now stand would not create an injustice to the State; vacating the decisions and remanding for new proceedings that would be largely duplicative of those before us, however, would, if anything, increase the risk of injury to petitioners by delaying even longer any federal consideration of their constitutional claims. Second, reviewing the present decisions carries little

or no risk of injustice in other cases because our application of harmless error is unique to the procedural posture of these cases. *See Poloroid Corp.,* 867 F.2d at 1420. Finally, we do not think our review of the panel's decisions will undermine the public's confidence in the judicial process under the circumstances here. Rather, our determination that a violation has occurred and our order that Judge Brett should recuse himself from all further proceedings involving these cases, should instill confidence in the judiciary. *See Parker,* 855 F.2d at 1527.

Therefore, we conclude that the proper remedy for Judge Brett's violations of § 455 is to review the previous rulings of the three-judge district court panel on the merits, but to direct Judge Brett to recuse himself from all further proceedings relating to these matters on remand, including any individual hearings that may be necessary. *See, e.g., supra* at pp. 1565–66.

### B. *Attorney Fees*

In the district court, counsel for petitioners sought an award of attorney fees and expenses for work performed through April 30, 1993, and for monthly payments thereafter, on the ground that petitioners were prevailing parties under 42 U.S.C. § 1988. R., Doc. 142. Section 1988 provides in pertinent part that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Counsel subsequently sought an award of fees for prosecuting the fee application, as well. R., Doc. 176.

The district court denied both motions by order entered June 29, 1993. *Id.,* Doc. 210. The court determined that the fee application was premature because the court had bifurcated the § 1983 claims from the habeas claims and had yet to address petitioners' § 1983 claims, which formed the predicate

---

**28.** Further, on remand Judge Brett should recuse himself from all cases consolidated in this appeal. Thus, he will be removed from the ultimate disposition of petitioners' claims.

**29.** In deciding whether to vacate the panel's previous rulings, we cannot simply pick and choose among the panel's findings and conclusions, as petitioners would have us do. Either we will vacate all the rulings, or none of them.

for an award of fees under § 1988. *Id.* at 3, 7. The court ruled that "any attorneys fees claim[ed] as [a] prevailing party under the 42 U.S.C. § 1983 claims must await another day." *Id.* at 8.

The district court subsequently denied counsel's motion to reconsider the denial of fees.[30] The court indicated that the award of any fees beyond those counsel already was receiving pursuant to his appointment under the Criminal Justice Act was premature, regardless of whether the fees were sought pursuant to § 1988 or pursuant to the language in *Hill v. Reynolds*, 942 F.2d at 1498, suggesting that an appropriate remedy for any constitutional deprivations might include "assessment against the state of costs and possibly even attorneys' fees." R., Doc. 233 at 2–3. The court noted that it had yet to enter any remedy of which attorney fees might be an appropriate part. *Id.* at 3.

"We review [a] district court's award of attorney fees for an abuse of discretion. Underlying factual findings will only be upset when clearly erroneous. However, a district court's statutory interpretation or legal analysis which provides the basis for the fee award is reviewable de novo." *Homeward Bound, Inc. v. Hissom Memorial Ctr.*, 963 F.2d 1352, 1355 (10th Cir.1992).

▮ The district court's rulings did not preclude the possibility that petitioners and their counsel may be entitled to an award of fees against the State in the future. Rather, the court ruled only that the present request for fees was premature. The district court did not err in so ruling.

Only after the district court conducts the analyses of petitioners' due process and equal protection claims that we have directed on remand can it enter appropriate remedies for petitioners' habeas claims. At that time, as indicated by our directions in *Hill*, 942 F.2d at 1498, the district court may consider whether the assessment of fees against the State would be an appropriate part of any remedy. *But see Kennedy v. Shillinger*, 971 F.2d 558, 562 (10th Cir.) (reversing an award

of fees against the State in a habeas proceeding on the ground that the State's conduct in that action did not "justify a sanction of this sort"), *cert. denied,* — U.S. ——, 113 S.Ct. 623, 121 L.Ed.2d 556 (1992). Likewise, when the district court ultimately addresses petitioners' civil rights claims, it may then consider whether petitioners are entitled to fees as prevailing parties under 42 U.S.C. § 1988. For the time being, we agree with the district court that the application for attorney fees is premature.

## IV. CONCLUSION

The orders and judgments of the United States District Court for the Northern District of Oklahoma are AFFIRMED IN PART, REVERSED IN PART, and the matter is REMANDED for further proceedings consistent with this opinion.

---

**30.** The parties did not designate the motion to reconsider as part of the record on appeal.